Revised May 4, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-40454

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CORNELIUS DEWITTE LOE, JR., also known as C.D. LOE;
BABO BEAZLEY LOE; LOE'S HIGHPORT, INC.,

Defendants - Appellants.

Consolidated with
Case No. 99-40495

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LOE'S HIGHPORT, INC.; BABO BEAZLEY LOE,

Defendants - Appellants.

Consolidated with
Case No. 99-41470

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BABO BEAZLEY LOE; LOE'S HIGHPORT, INC.,

Defendants - Appellants.

Consolidated with
Case No. 00-40690

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LOE'S HIGHPORT, INC.; BABO BEAZLEY LOE,

Defendants - Appellants.

---

Appeals from the United States District Court
for the Eastern District of Texas

---

April 17, 2001

Before HIGGINBOTHAM and DeMOSS, Circuit Judges, and FISH,[*] District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Appellants seek reversal of their convictions for conspiracy, wire fraud, mail fraud, tax fraud, and money laundering. They further challenge the sentence imposed by the district court. We are unpersuaded by the majority of their numerous assertions of error. However, as the evidence was insufficient to support a conviction on three of the money laundering charges, we affirm in part, reverse in part, and remand for resentencing.

I

Loe's Highport, Inc. operated Loe's Highport Marina, reputedly the largest inland marina in the world. Situated on Lake Texoma, the marina contains hundreds of boat slips, facilities for the sale of boats, a disco, a corporate office, and other facilities. Appellants Cornelius and Babo Loe ran the marina, which was located

---

[*] District Judge of the Northern District of Texas, sitting by designation.

on property leased from the U.S. Corps of Engineers. Under the lease, the Corps was to receive a percentage of marina revenues.

In 1990, the lake experienced the greatest flood in its history. Appellants submitted millions of dollars in claims to their insurers, Lexington Insurance Company and Chubb Insurance Company. In the wake of damage caused by a tornado in 1994, Appellants submitted additional claims to Continental Insurance Corporation.

In 1995, a disgruntled customer of LHI contacted the Federal Bureau of Investigations, claiming to be the victim of fraud. Further investigation by the FBI indicated that Appellants were underreporting boat sales to the Internal Revenue Service and the Corps. The FBI obtained a search warrant and seized thousands of documents from the marina.

On September 11, 1997, a grand jury sitting in the Eastern District of Texas indicted Appellants and three other individuals[1] on various conspiracy, tax fraud, wire fraud, mail fraud, and money laundering charges. A 1998 superseding indictment charged Appellants on thirty-one counts.[2] The Government alleged that Appellants failed to report millions in boat sales to the IRS and the Corps. Appellants were also accused of having defrauded their

---

[1] Andrew Scott Howard and Roger Foltz were acquitted. Henry Blume Loe was granted a mistrial; he was convicted in a subsequent trial.

[2] The various counts of the indictment did not uniformly encompass every defendant. In addition to the thirty-one substantive counts, the superseding indictment contained a forfeiture provision.

insurers, who collectively suffered millions of dollars in damage due to Appellants' submission of altered or fabricated invoices for losses and mitigation costs. The indictment alleged that Appellants conspired to undertake these unlawful activities, and that they used the proceeds of the fraud to acquire various forms of property, including a house in Florida.

The district court severed the counts and held two trials. Appellants were each convicted on some counts and acquitted on others. The district court sentenced Cornelius and Babo Loe to jail and required the Loes and LHI to pay large fines and restitution damages.

## II. CORNELIUS LOE

### A

Cornelius Loe argues that his conspiracy conviction should be reversed, asserting that his prosecution was barred by the statute of limitations. The government alleged only one act in furtherance of the conspiracy that fell within the five-year statute of limitations.[3] Cornelius Loe argues that the overt act alleged in the indictment could not support a conviction.

The indictment alleged that the defendants conspired to commit the following acts: "To devise and intend to devise a scheme and artifice to defraud insurance companies and to obtain money and

---

[3] *See* 18 U.S.C.A. § 3282 (2000) (articulating a five-year limitations period).

4

property by means of false and fraudulent pretenses and promises and [to do so in violation of 18 U.S.C.A. § 1341 (mail fraud) and in violation of 18 U.S.C.A. § 1343 (wire fraud)]." Given the statute of limitations, the Government had to prove an act in furtherance of the conspiracy after September 11, 1992. The indictment alleged: "On or about December, 1992, BABO BEAZLEY LOE, C.D. LOE, JR. and LOE's HIGHPORT, INC. effected a settlement of the lawsuit and received a portion of the fraudulently obtained insurance proceeds."

These allegations arose out of the following circumstances: In July 1991, the Loes' insurer, Lexington, interpleaded $638,388.34 in state court to determine the portion of proceeds due to the Loes and one of their tenants, David Hull. Hull apparently had refused to endorse Lexington insurance checks that he received, checks made out jointly to him and the Loes.[4] According to the Government, the vast majority of the interpleaded funds resulted from the insurance fraud undertaken by the Loes. On March 27, 1991, the state court ordered that $624,867.79[5] be paid to the Loes and that $15,520.55 be retained in the court registry. The court's calculation was incorrect, as these amounts sum to $640,388.34. The investment firm

---

[4] Hull had been the lessee of a restaurant located on the marina. Cornelius Loe allegedly attempted to enlist Hull in the conspiracy. In the wake of Hull's refusal to participate, the Loes ejected him from the premises and indicated that the restaurant would not be reopened. Litigation ensued.

[5] Each of these sums was paid with interest; the amounts shown reflect only principal.

handling the proceeds consequently paid the Loes only $622,867.79. By subsequent order, the court awarded Hull $13,520.55, leaving $2,000 in the account. All of these events occurred before September 11, 1992.

Meanwhile, the Loes sued Hull over a debt. In November or December, 1992, Hull's attorney and the Loes' attorney negotiated a possible settlement of litigation between the two parties. Hull's attorney proposed a disposition of the funds remaining in the registry account from this and earlier interpleader actions. Following this conversation, Hull's attorney asked the court to disburse $17,500 from an earlier interpleader to the Loes, plus the $2,000 remaining by mistake, and to disburse the remainder to Hull. The motion explained that the $17,500 was actually owed to Hull, but should be given to the Loes to settle the debt litigation. The court entered an order of disbursement on February 10, 1993.[6]

Based on these facts, Cornelius Loe contends, first, that the $2,000 payment was merely the "result" of the conspiracy, and not its object. He argues that the object of the conspiracy was defrauding the insurance company. As the fraud was completed outside the limitations period, Cornelius argues that the

---

[6] The motion made clear that LHI was entitled to the $2,000 as a result of the prior mistaken order. The court's subsequent order of disbursement specifically included a $2,000 disbursement to Babo Loe as trustee of LHI.

6

Government can not demonstrate the commission of an overt act in furtherance of the conspiratorial agreement.[7]

We are unpersuaded by Loe's argument. Receipt of the money was an object, and not merely a collateral result, of the conspiracy. The indictment so alleged, and a rational trier of fact could have arrived at this conclusion.

Our holding in *United States v. Girard*[8] is instructive. In *Girard*, we reversed the dismissal of an indictment, which the district court had found barred by the statute of limitations. The defendant in that case had allegedly conspired to defraud the government by rigging contract bids. Only the final payment was within the statute of limitations; the bid rigging had occurred long before.[9] We held that the receipt of the money was properly alleged as an object of the conspiracy, which did not end until the last payment was made. Girard's overt act was the acceptance and retention of the payment.[10] We made the common sense observation that the object of the conspiracy was not the making of rigged bids itself, but the subsequent receipt of the proceeds.[11] Similarly,

---

[7] *See Grunewald v. United States*, 353 U.S. 391, 396-97 (1957).

[8] 744 F.2d 1170 (5th Cir. 1984).

[9] *Girard*, 744 F.2d at 1171.

[10] *Id.* at 1173.

[11] *Id.* at 1172. The cases cited by Cornelius Loe are consistent with this reasoning, yet are factually distinguishable. In *United States v. Colon-Munoz*, 192 F.3d 210, 227-29 (1st Cir. 1999), the court held that obtaining specified property was the object of the conspiracy. Following the purchase of the property, a conspirator made payments on a loan financing the purchase. The court

receipt of the $2,000 in this case constituted an overt act falling within the limitations period.

Cornelius Loe also contends that actions taken by Hull's attorney are not actions taken by conspirators and therefore cannot be actions taken in furtherance of a conspiracy.[12] This argument fails, first, because receipt of the money by the Loes was an overt act within the scope of the conspiracy. Moreover, a rational jury could conclude that the Loes, as parties to the settlement agreement with Hull, took some overt action in connection with the terms of the agreement.

Third, Cornelius Loe argues that, even if the $2,000 payment made in February 1993 was an act in furtherance of the conspiracy, the indictment failed to allege this act. Loe notes that the indictment only alleged the 1992 settlement. In assessing whether a conspiracy conviction under 18 U.S.C. § 371 withstands a statute of limitations challenge, this Court has held that the overt acts alleged in the indictment and proved at trial mark the duration of

---

correctly concluded that these later actions were not undertaken in furtherance of the conspiracy. *See id.* In *United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976), we found that acts taken after false statements were made to the government were not part of a conspiracy. We emphasized that defendants were charged with conspiring to violate 18 U.S.C. § 1001, noting that the object of this offense was the making of false statements itself. We contrasted that offense with conspiracy to defraud the government. *See id.* at 927-28. As the conspiracy at issue in this case involves wire and mail fraud, it is distinguishable from *Davis*.

[12] *See United States v. Manges*, 110 F.3d 1162, 1170 (5th Cir. 1997) (holding that, where a conspirator did not mail the letter implicated in mail fraud, the mailing by another person was insufficient to support conviction).

the conspiracy.[13] Proof of an unalleged act can not surmount the statute of limitations bar.

Loe's argument fails, however, because the motion to disburse the $2,000 was itself part of the settlement, which was negotiated in November or December 1992. The indictment indicated that Appellants had "effected a settlement" and "received a portion of the fraudulently obtained insurance proceeds." The broad language of the indictment was sufficient to encompass the Loes' receipt of the $2,000.

Finally, Cornelius Loe contends that the $2,000 is "interest" from the interpled funds and consequently not the insurer's money. This argument is creative advocacy, but wrong. The $2,000 unquestionably represented the remainder of the principal originally registered with the court.[14]

B

Cornelius Loe further contends that the district court failed to properly instruct the jury regarding the statute of limitations in its aiding and abetting instruction for the conspiracy count. Count 17 of the indictment charged Appellants with (1) conspiring

---

[13] *See Davis*, 533 F.2d at 929.

[14] Babo Loe adopts Cornelius Loe's arguments. For the reasons given above, they also fail. Indeed, Babo Loe's case is much weaker, as the $2,000 check was issued in her name.

9

to violate the mail and wire fraud statutes, and (2) aiding and abetting this conspiracy, violating 18 U.S.C. § 2. As we understand his argument, Cornelius Loe asserts that it is unclear from the verdict whether the jury convicted him of aiding and abetting or for his role as a member of the conspiracy itself. He argues that the actus reus of aiding and abetting must itself occur within the limitations period. Where the aidor-abettor's acts fall outside this period, it is irrelevant that the overt acts taken by the conspirators were not time-barred. According to Cornelius Loe, the jury should have been informed of this distinction.

We doubt the validity of Loe's proposition. An aidor-abettor is guilty in a derivative sense; his guilt is contingent on the acts of another.[15] Courts have recognized this relationship by holding that aiding and abetting is governed by the statute of limitations applicable to the predicate offense.[16] One could reasonably conclude that, as long as the acts of the conspirator were not time-barred, it is of no moment that the aidor-abettor's conduct fell outside the limitations period. We need not decide this, however, as Cornelius Loe was a party to the Hull litigation. A rational jury could have found that any acts of aiding and

---

[15] *See* 18 U.S.C.A. § 2 (2000); *United States v. Campbell*, 426 F.2d 547, 553 (2d Cir. 1970) ("18 U.S.C. § 2 does not define a crime; rather it makes punishable as a principal one who aids or abets the commission of a substantive crime.").

[16] *See United States v. Musacchia*, 900 F.2d 493, 499 (2d Cir. 1990), *vacated on other grounds*, 955 F.2d 3 (2d Cir. 1991); *Campbell*, 426 F.2d at 553; *United States v. Gressett*, 773 F. Supp. 270, 281 (D. Kan. 1991).

10

abetting committed by Cornelius Loe fell within the five-year limitations period.

Even if we were to accept Cornelius Loe's argument, however, the jury instructions sufficiently informed the jury that the conspiracy limitations period applied to the aiding and abetting offense. The court admonished the jury to consider the "instructions as a whole" and to consider the aiding and abetting instructions "together" with the conspiracy instructions. We do not find that the court abused its discretion in incorporating the statute of limitations by reference.[17]

C

Cornelius Loe also challenges the sufficiency of the evidence supporting his conviction under Count 17. The applicable standard of review requires us to determine whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt.[18] The voluminous evidence in the record affirms that Loe's challenge is meritless. We decline Loe's invitation to re-weigh the credibility of the witnesses.[19]

---

[17] *See United States v. Pennington*, 20 F.3d 593, 600 (5th Cir. 1994) (reviewing a court's refusal to submit a proposed jury instruction for abuse of discretion).

[18] *See United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir. 1993).

[19] *See United States v. Bailey*, 444 U.S. 394, 414-15 (1980) (stating that it is for the jury, and not the court, to determine the credibility of witnesses).

11

Loe challenges the jury instructions for the conspiracy, mail fraud, and wire fraud counts based on the court's failure to define "materiality." Materiality is an element of the offenses of mail and wire fraud, and must be included in the jury charge.[20] In this case, the court instructed the jury that the fraud must be "material;" the only alleged error is its failure to define the term.[21]

We review a trial court's refusal to include a requested jury instruction for abuse of discretion, according the trial court "substantial latitude in formulating the charge."[22] We find reversible error only where the requested instruction is substantially correct; the actual charge given the jury did not substantially cover the content of the proposed instruction; and where the omission of the proposed instruction would "seriously impair the defendant's ability to present a defense."[23]

---

[20] *See Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Pettigrew*, 77 F.3d 1500, 1510-11 (5th Cir. 1996).

[21] The court instructed the jury in the following manner:

For purposes of both the mail and wire fraud statutes, a "scheme to defraud" includes any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises. A representation may be "false" when it constitutes a half truth, or effectively conceals a material fact, provided it is made with intent to defraud.

[22] *Pettigrew*, 77 F.3d at 1510.

[23] *Id.*

The court only deviated from the instruction proposed by Appellants in refusing to define "material."[24] We have held that failure to charge materiality to the jury requires reversal, without considering whether the error was harmless.[25] However, we have not found that failure to *define* materiality compels the same response. This is not a case where the actual instructions failed to "substantially cover the content of the proposed instruction."[26] Given the evidence presented at trial, which demonstrated that Appellants' fraud increased the insurers' payments by millions of dollars, the court's failure to define "material" was nothing more than harmless error.[27]

## III. BABO LOE

### A

Babo Loe contends that she can not be convicted of conspiracy on counts 1, 17, and 18, which alleged conspiracy to defraud the government and conspiracy to commit mail and wire fraud. She

---

[24] The proposed mail fraud instruction included the following definition of "materiality": "A statement is material if it has a natural tendency to influence, or is capable of influencing a decision by the party to whom the representation is made." In contrast, the proposed wire fraud instruction did not include a definition of materiality.

[25] *Pettigrew*, 77 F.3d at 1511.

[26] *Id*. at 1510.

[27] *See United States v. Davis*, 226 F.3d 346, 358-59 (5th Cir. 2000) (upholding a jury instruction that failed to define "materiality"). Babo Loe adopts Cornelius Loe's argument regarding the jury instructions. The preceding analysis applies equally to her case.

argues, first, that being convicted of conspiring with LHI, which she owned, is equivalent to being convicted of conspiring with herself. Second, she notes that, with the exception of Cornelius Loe, the other alleged co-conspirators were acquitted. She argues that she can not be convicted of conspiracy if the other co-conspirators were acquitted. Similarly, Babo Loe asserts that, if the evidence was insufficient to support Cornelius Loe's conviction under count 17, her conviction under that count also can not stand.

Her argument is without foundation. This Court has repeatedly held that the acquittal of all other co-conspirators does not bar conviction for conspiracy.[28] We therefore need not address Babo Loe's assertion that she can not be convicted of conspiring with LHI.[29]

B

Babo Loe also contends that the district court erred in denying her motion to suppress evidence seized pursuant to the search of the marina. As we understand her argument, she asserts that all of the evidence should be suppressed because of defects in the warrant and its execution. She contends that the warrant was

---

[28] *See United States v. Zuniga-Salinas*, 952 F.2d 876, 877-78 (5th Cir. 1992) (en banc); *United States v. Bermea*, 30 F.3d 1539, 1554 (5th Cir. 1994).

[29] As noted above, the evidence was sufficient to support Cornelius Loe's conspiracy conviction under count 17. Moreover, counts 1 and 18 involved acquitted conspirators other than LHI. Babo Loe's arguments regarding LHI are consequently irrelevant.

overbroad and that the FBI exceeded the scope of the warrant in conducting its search.

The affidavit upon which the warrant was based provided evidence that the Loes (1) had underreported boat sales revenue to the Corps; (2) had underreported boat sales revenue to the IRS; (3) had not paid state sales tax on cash cover charges obtained from bars and restaurants located on the marina; and (4) did not report the cash sale of various boats, in violation of the Bank Secrecy Act.[30] The warrant authorized the search of the following areas: two offices on level one of the corporate office building; all of level two; the storage area of level three; a tan mobile home designated, "Loe's Highport Yacht Sales"; and the safes and vaults of the Pompano's Club and Clipper Bar. An attachment to the search warrant listed approximately fifty-four categories of items to be seized. The warrant did not authorize a search of the Loe's residence, which was located on the third floor of the corporate office building.

In reviewing the district court's ruling on a motion to suppress evidence, we review factual findings for clear error.[31] We review de novo the court's legal conclusions regarding the constitutionality of law enforcement action, sufficiency of the

---

[30] *See* 31 U.S.C.A. §§ 5312(a)(2)(T), 5313 (2000).

[31] *See Davis*, 226 F.3d at 350.

15

warrant, and the reasonableness of an officer's reliance on a warrant.[32]

We address a Fourth Amendment challenge to a seizure conducted pursuant to a search warrant by asking, first, whether the seizure falls within the good-faith exception to the exclusionary rule.[33] Under the good-faith exception, where a warrant was based on an affidavit which was insufficient to establish probable cause, the evidence obtained is still admissible if law enforcement officials acted in "objectively reasonable good-faith reliance upon a search warrant."[34] If the good-faith exception applies, we need not examine whether the warrant was supported by probable cause.[35]

When officers execute a warrant in a manner that offends the Fourth Amendment, however, there is no "objectively reasonable good-faith reliance." Evidence which falls outside the scope of the warrant normally must be suppressed.[36] However, two exceptions apply. First, items of an "incriminatory character" which are found in the course of a legal search, yet which were not described in the search warrant, may be seized. Second, officers may seize

---

[32] *See id.*

[33] *See United States v. Davis*, 226 F.3d 346, 350 (5th Cir. 2000); *see also United States v. Leon*, 468 U.S. 897 (1984).

[34] *Davis*, 226 F.3d at 351 (quoting *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997)).

[35] *Davis*, 226 F.3d at 351.

[36] *See Horton v. California*, 496 U.S. 128, 140 (1990).

property which is not described in the warrant if the property exhibits a "sufficient nexus" to the crime under investigation.[37] The Fourth Amendment does not countenance, however, a "general, exploratory search through personal belongings."[38]

Although the bulk of her arguments address the sufficiency of the warrant itself, Babo Loe contends that the fourteen-hour search of the marina exceeded the scope of the warrant. Agents seized several hundred boxes of documents, of which 130 boxes were subsequently returned as irrelevant to the Government's investigation. Babo Loe fails to cite specific pieces of evidence that were seized outside the scope of the warrant. While Babo Loe argued to the district court that a variety of broad categories of evidence were seized outside the scope of the warrant,[39] her brief does not indicate whether she is reiterating those arguments on appeal. On appeal, she refers only to the seizure of estate

---

[37] *See Creamer v. Porter*, 754 F.2d 1311, 1318 (5th Cir. 1985).

[38] *Id.*

[39] The district court examined the following categories of evidence which Babo Loe objected to as falling outside the scope of the warrant: (1) various date books, organizers, calendars, attendance lists, and Rolodexes; (2) entirely personal notes and files; (3) litigation and other legal files, including files relating to the Hull litigation; (4) state and federal labor law files; (5) trust and estate planning files; (6) gift and estate tax files; (7) files on property damage; (8) medical and health insurance files; (9) life insurance files; (10) automobile insurance files; (11) other insurance files unrelated to property insurance; (12) maps and floor plans; and (13) an audiotape. The district court found that, while some of the preceding categories of items appeared to fall outside the warrant's scope and did not demonstrate a sufficient nexus to the crimes investigated, the officers did not act in "blatant disregard of the search warrant."

planning files, the Loes' personal files, whole computers and computer files, and litigation files.

Although we are troubled by the scope of the search conducted, we are unprepared to say that the items seized should be suppressed on the basis that they exceeded the terms of the warrant. The warrant specifically authorized the seizure of computers and computer files. Although the warrant did not refer to estate planning files, it authorized, for example, the seizure of files relating to any and all wire transfers and information relating to stock/brokerage accounts. Without specifics, we are unable to evaluate the merits of Babo Loe's contention that "personal files" were seized. Finally, while the warrant did not expressly authorize the seizure of litigation files, certain non-privileged documents contained within those files may have fallen within the scope of the warrant. Again, without specifics, we are unable to conclude that any given file was seized improperly.

Babo Loe also complains of the extensive search of the Loe residence. The warrant authorized a search of the third-floor storage area. Because the elevator was either locked or inoperable, agents could only access the storage area through the Loes' residence, which was also on the third floor. Despite the warrant's failure to authorize a search of the residence, the Government

argues that a "protective sweep" was necessary.[40] The FBI knew prior to the search that the Loes were registered gun owners, and a search of their persons did not reveal firearms. Although examining drawers and closets may or may not have been quick and limited—and therefore within the scope of a protective sweep[41]—we need not address this issue. No items from the residence were seized, nor was anything from the residence used as evidence at trial.

Babo Loe further argues that the warrant itself was overbroad because it authorized the seizure of many categories of documents unrelated to the crimes described in the affidavit. The good-faith exception articulated above does not apply where there is a discrepancy between the assertions in the affidavit and the scope of the warrant sufficient to make reliance on the warrant unreasonable.[42]

While the wisdom of including such a broad array of documents in the warrant is questionable, we are unprepared to find the

---

[40] A protective sweep is justified when the searching officer reasonably believed "that the area swept harbored an individual posing a danger to the officer or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

[41] *See id.* ("A 'protective sweep' is a quick and limited search of premises . . . narrowly confined to a cursory visual inspection of those places in which a person might be hiding."). *But see United States v. Hernandez*, 941 F.2d 133, 135-38 (2d Cir. 1991) (extending the proper scope of a protective sweep to a search for weapons that the arrestee could easily reach).

[42] *See United States v. Davis*, 226 F.3d 346, 352 (5th Cir. 2000); *United States v. Cherna*, 184 F.3d 403, 409-10 (5th Cir. 1999). Babo Loe does not invoke the other bases for not applying the good-faith exception. *See Cherna*, 184 F.3d at 407-08. Given the specificity of the warrant, which lists fifty-four categories of evidence, we find that the warrant did not violate the particularity requirement of the Fourth Amendment. *See United States v. Kimbrough*, 69 F.3d 723, 727 (5th Cir. 1995).

officers' reliance on the warrant unreasonable. The district court found that documents such as real estate and insurance files were logical indicators of LHI's gross fixed assets. We agree. A company's gross fixed assets may indicate a failure to report income to the IRS and Corps, as well as Appellants' knowledge of the unreported income. The twenty-two-page affidavit provided ample indication of the Loes' failure to report income to the IRS and Corps. Although the warrant authorized seizure of a vast array of documents, the crimes alleged in the affidavit could reasonably be viewed as requiring a search of this magnitude. The fifty-year history of the marina and the scope of the operations under investigation lend additional support to the breadth of the search warrant. Moreover, the warrant expressly limited the search to a portion of the marina's business premises, and nothing was seized from the Loes' residence.[43] The Loes point to the FBI's prompt return of the 130 boxes of irrelevant documents as evidence of the warrant's overbreadth. However, this is merely proof that the proper breadth of a warrant is always clearer after the fact.

We find only that the agents' reliance on the warrant was not objectively unreasonable and did not indicate bad faith.[44]

---

[43] The search in this case is therefore distinguishable from the "all records" search discussed in *United States v. Humphrey*, 104 F.3d 65 (5th Cir. 1997). In *Humphrey*, we recognized that the Fourth Amendment requires "closer scrutiny of an all records search of a residence," noting that a search of this nature would only be upheld in "extreme cases." *See id.* at 69 & n.2.

[44] Cornelius Loe adopts Babo Loe's Fourth Amendment arguments. For the reasons given above, these arguments also fail as applied to Cornelius Loe.

Babo Loe argues that the district court improperly applied the Sentencing Guidelines in determining her sentence for money laundering. She contends that fraud was the "essence" of her offense. Accordingly, Babo Loe argues that she should have been sentenced under the fraud guidelines, not the money laundering guidelines.

This Court reviews a court's legal interpretations of the Guidelines de novo.[45] A sentencing court's refusal to depart from the applicable guideline is unreviewable, however, unless the court mistakenly believed that it lacked the authority to grant such a departure.[46] The district court here was aware of its power to grant a downward departure.

Babo Loe attempts to escape this limitation on our power to review sentencing decisions. She asserts that a court's application of a guideline range is a purely legal interpretation, meriting de novo review. We find no error in the sentencing court's decision to apply section 2S.1 of the Guidelines to Babo Loe's violation of 18 U.S.C. § 1957. Appendix A of the Guidelines indicates that guideline section 2S1.2 corresponds with violations of 18 U.S.C. §

---

[45] *See United States v. Barbontin*, 907 F.2d 1494, 1497 (5th Cir. 1990).

[46] *See United States v. Powers*, 168 F.3d 741, 753 (5th Cir. 1999).

1957.[47] We would not hesitate to apply de novo review and correct a court's misapprehension of this elementary component of the sentencing architecture constructed by the Guidelines. However, where a court finds that the facts in a section 1957 case are sufficiently atypical as to warrant the application of a lower guideline range, its decision constitutes a downward departure.[48] The court in such an instance does not misinterpret the Guidelines by failing to apply section 2S1.2; it exercises its discretion under the facts of that case.[49] The sentencing court's refusal to apply a different set of guidelines in this case therefore constitutes a refusal to grant a downward departure—a decision which this Court may not review.

D

Babo Loe also challenges her money laundering conviction on count 25, arguing that the evidence was insufficient to support the verdict. We review the evidence to determine whether a reasonable trier of fact could have found that the evidence established guilt

---

[47] *See* U.S.S.G. App. A. (2000); U.S.S.G. § 1B1.2(a); U.S.S.G. § 2S1.2, cmt.

[48] *See United States v. Dadi*, 235 F.3d 945, 954-55 (5th Cir. 2000); *United States v. Hemmingson*, 157 F.3d 347, 360-63 (5th Cir. 1998). Our Court therefore differs from those circuits which view the initial choice of which guideline to apply as a question of law subject to de novo review. *See United States v. Smith*, 186 F.3d 290, 297 (3d Cir. 1999).

[49] *See* 18 U.S.C.A. § 3553(b) (2000) (requiring a court to follow the applicable guideline unless it finds that "there exists an aggravating or mitigating circumstance . . . not adequately taken into consideration by the Sentencing Commission").

beyond a reasonable doubt.[50] Babo Loe notes that she spent some of the fraudulently obtained money years after having received it. She contends that the passage of time negates the inference that she knew that she was spending "dirty" funds. This argument is meritless. A rational jury could find that she possessed such knowledge at the time of the transaction. Babo Loe asks this Court to effectively re-weigh the evidence. We refrain from taking such a step and reject her sufficiency challenge.[51]

E

Babo Loe argues that the forfeiture of the Florida property should be reversed on three grounds: the indictment did not allege the extent of her interest in the property; the forfeiture was not incorporated in the judgment; and the forfeiture is disproportionate to the offense. We reject each of these contentions.

First, the indictment was sufficient. Rule 7(c)(2) of the Federal Rules of Criminal Procedure states: "No judgment of forfeiture may be entered in a criminal proceeding unless the indictment or information shall allege the extent of the interest or property subject to forfeiture." As this Court has noted, "[t]he purpose of the notice of forfeiture in the indictment is to inform

---

[50] *See United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir. 1993).

[51] *See United States v. Bailey*, 444 U.S. 394, 414 (1980).

23

the defendant that the government seeks forfeiture as a remedy."[52] An indictment is sufficiently specific if it "puts the defendant on notice that the government seeks forfeiture and identifies the assets with sufficient specificity to permit the defendant to marshal evidence in their defense."[53] Babo Loe asserts that the indictment was insufficient because it failed to specify the interest in the property that was subject to forfeiture, which the court later determined to be 52.6 percent. Rule 7(c)(2) does not require the level of detail sought by Babo Loe. She had ample notice that the Florida property itself was subject to forfeiture. Her defense could not have been jeopardized by the Government's failure to more precisely delineate the scope of the forfeiture.[54]

Second, the forfeiture was incorporated in the judgment. Rule 32(d)(2) of the Federal Rules of Criminal Procedure provides: "At sentencing, a final order of forfeiture shall be made part of the sentence and included in the judgment." In this case, Judge Brown indicated orally at the sentencing hearing that the Florida property would be forfeited. Moreover, the court issued a written preliminary order of forfeiture on March 31, 1999. However, the judgments of conviction did not refer to the March 31st order or discuss forfeiture. Upon the Government's motion, the court entered

---

[52] *United States v. Puma*, 937 F.2d 151, 156 (5th Cir. 1991) (quoting *United States v. Cauble*, 706 F.2d 1322, 1347 (5th Cir. 1983)).

[53] *Puma*, 937 F.2d at 156.

[54] *See id.* at 156-57.

a *nunc pro tunc* amendment to the written order describing the forfeited property.[55] We find nothing objectionable about this procedure. Moreover, in the event of a conflict between an oral judgment and a written order, the oral ruling prevails.[56] The court's oral pronouncement on forfeiture, which it issued at the sentencing hearing, consequently remains effective in the face of a contrary written judgment.

Finally, the forfeiture is not excessive. The court ordered Babo Loe to forfeit only so much of the property as was purchased with illegally obtained funds—money that she had no right to in the first place.[57] We therefore find no disproportionality, let alone the "gross disproportionality" required by *United States v. Bajakajian*.[58]

F

Babo Loe argues that the Government failed to adduce evidence sufficient to support venue for count 19, mail fraud. As a "continuing offense," mail fraud may be prosecuted in "any district

---

[55] *See* Fed. R. Crim. Proc. 36 (2000).

[56] *See United States v. McDowell*, 109 F.3d 214, 217 (5th Cir. 1997); *United States v. Shaw*, 920 F.2d 1225, 1231 (5th Cir. 1991).

[57] *See United States v. Tilley*, 18 F.3d 295, 300 (5th Cir. 1994).

[58] 524 U.S. 321, 334 (1998). Cornelius Loe adopts Babo Loe's arguments regarding the forfeiture. For the reasons given above, they fail as applied to his case.

in which such offense was begun, continued, or completed."[59] Although the government must prove venue by the preponderance of the evidence, circumstantial evidence alone is sufficient to establish venue.[60] On appeal, we view the evidence in the light most favorable to the Government, drawing all reasonable inferences in favor of the verdict.[61]

Babo Loe's contention is meritless. The evidence supports a finding that on three occasions she mailed numerous documents from locations in the Eastern District of Texas in furtherance of the fraudulent conspiracy. Babo Loe contends that, if the three mailings described above support her conviction on mail fraud, that count 19 suffered from duplicity. "An indictment may be duplicitous if it joins in a single Count two or more distinct offenses."[62] However, count 19 only alleges a single act of mail fraud. Babo Loe also does not claim prejudice as a result of duplicity in count 19.[63]

Her argument is more appropriately considered as a claimed variance. Variance results when "the charging terms of the indictment remain unaltered, but the evidence at trial proves facts

---

[59] 18 U.S.C.A. § 3237(a) (2000).

[60] *See United States v. White*, 611 F.2d 531, 534-35 (1980).

[61] *Id.* at 535.

[62] *See United States v. Sharpe*, 193 F.3d 852, 870 (5th Cir. 1999).

[63] *See United States v. Drury*, 687 F.2d 63, 66 (5th Cir. 1983) (finding that, even if an indictment was duplicitous, there was no prejudice).

other than those alleged in the indictment."[64] The dates of the three mailings differ slightly from the date presented in the indictment. Moreover, three acts of mail fraud were proven at trial, whereas the indictment only charged one act. We are unconvinced that this variance affected Appellant's "substantial rights."[65] Babo Loe does not allege prejudice and we do not discern the potential for such prejudice on the facts of this case.

G

Babo Loe further contends that the cumulative effect of numerous evidentiary errors committed by the district court violated her rights under the Confrontation Clause.[66] We review evidentiary rulings for an abuse of discretion.[67] Although Babo Loe provides numerous cites to the record, she fails to indicate how a specific cited decision by the court was erroneous. More fundamentally, she concedes that none of these decisions constituted an abuse of discretion. She argues that the cumulative effect of these "errors" was prejudicial to her Sixth Amendment rights.

---

[64] *Sharpe*, 193 F.3d at 866 (quotations omitted).

[65] *See* Fed. R. Crim. Proc. 52(a) (2000); *Sharpe*, 193 F.3d at 866; *United States v. Faulkner*, 17 F.3d 745, 760 (5th Cir. 1994); *United States v. Winship*, 724 F.2d 1116, 1122 (5th Cir. 1984).

[66] U.S. Const. amend. VI.

[67] *See United States v. Pace*, 10 F.3d 1106, 1113-14 (5th Cir. 1993).

We fail to see how the whole can be greater than the sum of its parts. There can be no error if the district court acted within its discretion. As the cumulative effect of such valid discretionary decisions cannot violate the Sixth Amendment, Babo Loe's argument fails.[68]

H

Babo Loe contends that the district court denied her right to compulsory process by quashing the subpoena *duces tecum* she had issued to the Corps. Under Rule 17(c) of the Federal Rules of Criminal Procedure, a district court has discretion to "quash or modify the subpoena if compliance would be unreasonable or oppressive."[69] On appeal, Babo Loe must show that (1) the subpoenaed document is relevant, (2) it is admissible, and (3) that it has been requested with adequate specificity.[70] We review the grant of a motion to quash for abuse of discretion.[71]

---

[68] Babo Loe's reliance on *United States v. Riddle*, 103 F.3d 423, 434-35 (5th Cir. 1997), is misplaced. In that case, we held that the cumulative effect of actual errors—i.e., rulings in which the district court abused its discretion—prejudiced the defendant. We recognize that evidentiary rulings must be viewed in context. A decision to exclude evidence may, in light of prior evidentiary rulings, constitute an abuse of discretion where that same decision would not be erroneous if considered in isolation. Our holding today does not deny the path-dependent nature of individual evidentiary rulings. In this case, Babo Loe fails to contend or prove that a specific decision was itself erroneous in light of prior rulings. We hold that the cumulative effect of a series of valid discretionary judgments can not deny defendant's rights under the Confrontation Clause.

[69] Fed. R. Crim. Proc. 17(c) (2000).

[70] *See United States v. Arditti*, 955 F.2d 331, 345 (5th Cir. 1992).

[71] *See id.*

28

The district court quashed the subpoena on the basis that it lacked the requisite specificity. Babo Loe does not challenge the court's finding. Instead, she argues that the court should have modified, rather than quashed, the subpoena. This was not an abuse of discretion.[72]

IV. LOE'S HIGHPORT, INC.

A

LHI argues that the money laundering convictions for counts 22-24 must be reversed. LHI contends, first, that the evidence can not establish that at least $10,000 of the "traced" money was fraudulently obtained "dirty money."[73] LHI also argues that the district court's jury instructions were erroneous. The court told the jury that "you may find, but are not required to find, that in a [transaction from a commingled fund], as the language of Section 1957 permits, that the transacted funds, at least up to the full amount originally derived from the crime, were the proceeds of the criminal activity or derived from that activity."

As this Court has noted, money is fungible.[74] The commingling of assets has placed courts in the difficult position of separating "clean" from "dirty" funds. Although any accounting method employed

---

[72] We note that Babo Loe never filed a request for a modified subpoena.

[73] *See* 18 U.S.C.A. § 1957 (2000).

[74] *See United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000).

to this end inevitably exhibits certain "arbitrary" characteristics,[75] a rule of decision is necessary. In *United States v. Davis*,[76] we stated the following rule for section 1957 cases involving commingled accounts: "[W]hen the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account."[77] *Davis* also implies the converse—that where an account contains clean funds sufficient to cover a withdrawal, the Government can not prove beyond a reasonable doubt that the withdrawal contained dirty money.[78]

In this case, counts 22-24 were based on transactions originating in a $776,742 transfer from an account containing $2,205,000 paid by Lexington to the Loes. Of the $2,205,000, only $470,790.22 was fraudulently obtained. Since there was enough clean

---

[75] *See United States v. Moore*, 27 F.3d 969, 976-77 (4th Cir. 1994).

[76] 226 F.3d 346 (5th Cir. 2000).

[77] *Davis*, 226 F.3d at 357; *see also United States v. Rutgard*, 116 F.3d 1270, 1291-92 (9th Cir. 1997) (holding that money from a commingled account is presumed to be clean). *But cf. United States v. Tencer*, 107 F.3d 1120, 1131 (5th Cir. 1997) (holding that, for a conviction under section 1956, "it is sufficient if the government proves at least part of the money represents [proceeds of mail fraud]"). We note that the Fourth and Third Circuits employ a presumption contrary to that which we applied in *Davis*. *See United States v. Sokolow*, 91 F.3d 396, 409 (3d Cir. 1996) (articulating presumption that money from commingled account is dirty); *Moore*, 27 F.3d at 976-77 (same). The presumption employed in *Sokolow* and *Moore* may be constitutionally infirm. *Cf. Sandstrom v. Montana*, 442 U.S. 510 (1979) (holding that jury instructions creating a conclusive presumption against the defendant as to an element of a crime violates the Fourteenth Amendment).

[78] *Cf. United States v. Poole*, 557 F.2d 531, 535-36 (5th Cir. 1977).

money in the account to cover the $776,742 transfer, the rule of *Davis* mandates reversal of counts 22-24. No reasonable juror could conclude that these money laundering convictions were warranted beyond a reasonable doubt.[79] Moreover, the jury instructions were also plainly inconsistent with *Davis*. As Babo Loe adopts LHI's arguments with respect to counts 22-24,[80] her convictions under these counts must also be reversed.[81]

---

[79] *See United States v. Giraldi*, 86 F.3d 1368, 1371 (5th Cir. 1996).

[80] Neither party appeals its money laundering convictions under counts 25, 29, 30, and 31. As discussed in a preceding section of this opinion, Babo Loe's sufficiency of the evidence challenge to count 25 is without merit. She did not adopt LHI's arguments for purposes of count 25. However, we note that application of the *Davis* rule would not change the outcome of her conviction on this count.

[81] There is much to be said in favor of a "proportionality" rule. Under such a rule, courts would treat any withdrawal from an account as containing proportional fractions of clean and dirty money. Applying the facts of the instant case, "dirty" funds ($470,790.22) comprised approximately 21 per cent of the total amount in the account ($2,205,00). Applying this same proportion to the withdrawal in question ($776,742), $165,842.42 of the funds withdrawn would be" dirty." As this amount exceeds the $10,000 threshold articulated in section 1957, LHI's conviction would be justified.
  A proportionality rule would avoid some of the oddities associated with the *Davis* approach. Under *Davis*, if aggregate withdrawals are less than the amount of clean funds in the account, the statute is not violated. However, once withdrawals exceed the clean funds in the account, all subsequent transactions (including the transaction by which the defendant exceeds the clean-funds threshold) are transformed into "dirty" transfers warranting conviction. A proportionality rule avoids this somewhat mechanistic result.
  Moreover, a proportionality rule is more sensitive to the fungible nature of money. Whereas the *Davis* rule engages in a presumption that clean money is spent before dirty money, a proportionality rule recognizes that a withdrawal mirrors the sources of the money in the account. If the account is the product of clean and dirty money, a withdrawal should reflect this arrangement in equal proportions.
  Finally, this rule would be more faithful to the plain language of the statute. The *Davis* rule allows a court to look at the total number of withdrawals from an account, aggregating a series of transactions. *See United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000); *see also United States v. Heath*, 970 F.2d 1397, 1404 (5th Cir. 1992). However, section 1957 imposes liability on a transaction-by-transaction basis. *See* 18 U.S.C.A. § 1957 ("Whoever . . . knowingly engages . . . in a monetary transaction in [dirty money] of a value greater than $10,000 . . . shall be punished."). A proportionality rule would avoid the aggregation mechanism condoned in *Davis* and more accurately reflect the

31

LHI also argues that the indictments for money laundering were defective because they failed to list a "specified unlawful activity" that was the source of the laundered money. Section 1957 requires that the defendant (1) knowingly (2) use "criminally derived property of a value greater than $10,000" (3) in a monetary transaction, and (4) that the property must be "derived from specified unlawful activity."[82]

Each of the money laundering counts referred to one of the counts alleging conspiracy to commit mail and wire fraud. The conspiracy counts listed several alleged acts of mail and wire fraud. LHI notes that the money laundering counts of the indictment did not specify which act of mail or wire fraud was the source of the funds. Consequently, LHI argues that the indictment allowed for a non-unanimous jury verdict regarding which act of fraud was the source of the money.

This argument misinterprets the term, "specified unlawful activity." This term does not imply that the indictment must list a specific unlawful act that is the source of the money. Instead, the statute proposes "specified unlawful activity" as a term of

---

language and purpose of the statute. However, as the *Davis* rule is binding on this panel, *see Broussard v. Southern Pac. Transp. Co.*, 665 F.2d 1387, 1389 (5th Cir. 1982) (en banc), we must apply it to the case at bar, leaving change to a case appropriately before the en banc court.

[82] 18 U.S.C.A. § 1957 (2000).

art.[83] A specified unlawful activity is one of a set of federal crimes listed in 18 U.S.C.A. § 1956(c)(7). Section 1957 merely requires money to be derived from a particular set of federal crimes. It does not require the indictment to specify which unlawful activity generated the funds in question. In any case, we note that the money laundering counts of the indictment included allegations sufficient to (1) enumerate each element of the offense; (2) provide Appellants with notice of the precise transactions for which they were being prosecuted; and (3) prevent future prosecutions for the same offense.[84] Thus, the indictment was sufficient.

Nor is jury unanimity regarding the specified unlawful activity required. Our holding in *United States v. Short*[85] affirms this conclusion. In *Short*, we upheld the conviction of a defendant as a "supervisor" of a continuing criminal enterprise.[86] We found that the jury need not unanimously agree on the identities of the five subordinates required to make the defendant a supervisor.[87] *Short* indicates that contextual, predicate information need not be as precisely proven as the defendant's acts. In this case, LHI was

---

[83] *See* 18 U.S.C.A. § 1957(f)(3) (2000).

[84] *See United States v. Flores*, 63 F.3d 1342, 1360-61 (5th Cir. 1995).

[85] 181 F.3d 620 (5th Cir. 1999).

[86] *See* 21 U.S.C.A. § 848 (2000); *Short*, 181 F.3d at 623-24.

[87] *See Short*, 181 F.3d at 623-24.

indicted for the commission of a single act, engaging in a monetary transaction. This act was clearly identified to the jury.[88]

C

LHI further argues that the district court erred in excluding the testimony of an expert witness during the trial of counts 7-10. These counts accused LHI of having made false statements on a tax return, in violation of 26 U.S.C. § 7206(1). The defense expert would have testified that LHI overpaid, rather than underpaid, its taxes. LHI contends that the district court abused its discretion and deprived LHI of its Sixth Amendment right to call witnesses in its favor.

The district court offered three reasons for excluding the testimony. First, the court found that the evidence was irrelevant. Second, the court expressed serious doubts as to whether tax liability could be accurately calculated given the poor condition of LHI's books. Finally, the court found that the defense provided the Government with inadequate notice that Appellants intended to offer the expert's testimony.

---

[88] LHI's reliance on *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977), is misplaced. In that case, we held that jury instructions that did not require unanimity regarding the defendant's actus reus violated his Sixth Amendment rights. *See id.* at 458-59. The jurors in *Gipson* could have disagreed as to whether the defendant "received" or "sold" stolen property. Consequently, the verdict could not be deemed unanimous. *See id.* at 458. In contrast, the conduct of the defendant in the instant case was identified to the jury.

LHI challenges each of the preceding bases for the court's decision. LHI contends that evidence of tax liability is relevant to its motive to make a false statement.[89] LHI argues that proof of motive tends to prove knowledge and intent. Therefore, if LHI had overpaid its taxes, it is less likely that it would have intended to make the false statement.

Although we recognize the intuitive appeal of this syllogism, we are unpersuaded by LHI's reasoning. This Court has specifically held that evidence of tax liability is irrelevant in false statement cases.[90] Although reliance on a qualified tax preparer is an affirmative defense in such cases,[91] LHI does not contend that the expert's testimony would have established reliance.

Even if we found this testimony to be logically relevant to LHI's intent, a court could reasonably find that other factors outweighed its probative value. The court could have determined that evidence of tax liability would confuse the jury, misleading it into believing that tax liability is an element of the offense. Moreover, the court could have found that such proof would waste time on collateral issues.[92] Nothing prevented Appellants or their

---

[89] Violation of 26 U.S.C. § 7206(1) requires the Government to prove, inter alia, that a defendant willfully made and subscribed to false tax returns and that it did not believe the returns to be true as to every material matter. *See United States v. Wilson*, 887 F.2d 69, 72 (5th Cir. 1989).

[90] *See United States v. Johnson*, 558 F.2d 744, 745 (5th Cir. 1977).

[91] *See Wilson*, 887 F.3d at 73.

[92] *See* Fed. R. Evid. 403 (2000); *Johnson*, 558 F.2d at 747.

tax preparers from testifying that they were unaware of their tax liability or that they did not intend to make a false statement. We find that the court did not abuse its discretion in excluding the testimony.[93] We therefore need not address the adequacy of the court's additional reasons for excluding the testimony.[94]

D

LHI further contends that the district court erred in computing restitution for the fraudulent invoices submitted to the insurers. The district court ordered restitution of the entire value of the invoices with no reduction to reflect the actual costs that LHI incurred in mitigating losses. It is undisputed that LHI expended substantial sums in mitigating damage from the 1990 flood. On the basis of evidence submitted to the district court, LHI contends that court abused its discretion in failing to offset LHI's expenses from the restitution amount.[95]

LHI's argument is meritless. The court found that neither the fraudulent invoices nor other evidence credibly reflected the actual expenses incurred by LHI. LHI was unable to provide reliable evidence supporting its claims. Although a defendant in LHI's

---

[93] *See United States v. Willis*, 38 F.3d 170, 174 (5th Cir. 1994) (stating that a court's decision to exclude expert testimony is reviewed for abuse of discretion).

[94] Babo Loe adopts the preceding argument, which fails for the reasons given above.

[95] *See United States v. Chaney*, 964 F.2d 437, 451-52 (5th Cir. 1992) (articulating an abuse-of-discretion standard for restitution calculations).

36

position would normally be entitled to a reduction in the restitution award,[96] the absence of credible evidence to support a claim of mitigation loss would preclude such an offset. We find that the court's decision did not constitute an abuse of discretion.[97]


## V. CONCLUSION

We AFFIRM the conviction of Appellants as to all counts except counts 22-24. As the evidence was insufficient to support a verdict, we REVERSE the convictions of Babo Loe and LHI on counts 22-24 and REMAND to the district court for resentencing.

---

[96] *See* U.S.S.G. § 2F1.1, cmt. note 8 (2000).

[97] Cornelius Loe adopts the preceding argument. For the reasons articulated above, this argument fails as applied to his case.

DeMOSS, Circuit Judge, dissenting:


With all due respect, I cannot join in the generalizations and circuitous reasoning by which the majority concludes that the conduct charged in Count 17 of the indictment was not barred by the five-year statute of limitations. Count 17 of the indictment charged a conspiracy (in violation of § 371) "to defraud insurance companies and to obtain money and property by means of false and fraudulent pretenses and promises by use of facilities of the U.S. mail (in violation of § 1341) and by use of transmissions in interstate commerce by means of wire communications (in violation of § 1343).

The elements of the offense prohibited by § 371 are (1) the making of an agreement by two or more persons to violate a criminal statute of the United States, and (2) the doing by one or more such persons of any act to effect the object of such conspiracy, i.e., the violation agreed upon. In this case, Count 17 charges a conspiracy to violate § 1341 (mail fraud) and § 1343 (wire fraud). The elements of the offense of mail fraud are (1) the devising of a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and (2) placing any matter or thing in the U.S. mails for the purpose of executing such scheme. The elements of wire fraud are (1)

38

devising a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and (2) transmitting by means of wire, radio, or television communication in interstate or foreign commerce any writing, sign, signal, picture, or sound for the purpose of executing such scheme.

In the indictment in this case, Count 17 contains a separate section headed "THE SCHEME TO DEFRAUD." That portion of Count 17 states that the defendants "would submit or cause to be submitted, false and fraudulent claims to the insurance companies covering the losses caused by the 1990 flood in order to inflate the loss to the marina and the restaurants." This portion of Count 17 goes on to indicate that the false and fraudulent claims "would be false and fraudulent in one or more of the following ways" and there follows six separate subparagraphs specifically describing various fictitious claims, duplicate invoices, invoices for losses which had not actually occurred, invoices which were altered to increase the amount of expenditure made, fictitious corporations that were formed to be third-party contractors, and false claims for business interruption loss which understated the amount of income to the marina.

There then follows another subpart of Count 17 headed "MANNER AND MEANS" which alleges the manner and means by which the scheme to defraud would be accomplished as follows:

1)The defendants would systematically inflate casualty and business interruption losses to the property and businesses of LOE'S HIGHPORT, INC.

2)The defendants would submit, or cause to be submitted, via the United States Postal Service or by means of interstate wire communications, false claims to the insurance companies covering such losses for payment.

I think it is critically important to note that in the subparts of Count 17 of the indictment, headed "THE CONSPIRACY", "THE SCHEME TO DEFRAUD", and the "MANNER AND MEANS", there is absolutely no mention whatsoever of any controversy between the defendants and David Hull, who leased a portion of the marina premises for operating a waterfront restaurant. Likewise, there is no mention of any kind of any controversy with David Hull regarding distribution of insurance proceeds in connection with the 1990 flood damage.

Count 17 further alleged in 22 separate subparagraphs overt acts which the defendants committed on specific days and in specific manner. The first 20 of these subparagraphs allege overt acts which expressly include references to use of facilities of the U.S. Postal Service or interstate wire communications. The first 20 of these overt acts allege conduct occurring on dates that were more than five years prior to the filing of the initial indictment in this case. The overt act in paragraph 21 is alleged to have occurred on November 26, 1990, which is more than five years prior

to the filing of the original indictment in this case on September 21, 1997; and this subparagraph contains absolutely no allegation of any kind relating to the use of facilities of the U.S. Post Office or any interstate wire transmission facility.  The conduct described in subparagraph 21 is the filing of a lawsuit against David Hull, individually, and in his capacity as Waterfront Restaurant.  David Hull is not a named co-conspirator in the indictment nor is he named as an unindicted co-conspirator.

The last overt act alleged in Count 17 reads as follows:

> 22)On or about December, 1992, BABO BEAZLEY LOE, C.D. LOE, JR. and LOE'S HIGHPORT, INC. effected a settlement of the lawsuit and received a portion of the fraudulently obtained insurance proceeds.

While the date of December 1992 would be within five years of the filing of the initial indictment, there is absolutely nothing in this subparagraph 22 which specifies the use of any U.S. Post Office facility nor any interstate wire transmission facility. Neither § 1341 nor § 1343 makes a crime  out of merely fraudulent misrepresentations or false promises; rather, each of these statutory provisions makes a crime out of (1) use of the U.S. mails (§ 1341) or (2) transmission of a matter by interstate wire communications for the purpose of "executing" some fraudulent scheme.  I find very convincing the arguments advanced by defendant, C. D. Loe, Jr., (and adopted by Babo Beazley Loe and Loe's Highport, Inc.) that no such conduct on the part of any of

-**41**-

the defendants was alleged in subparagraphs 21 and 22 of Count 17, and there is no testimony in this record that any such conduct did occur. The language in paragraph 22 of Count 17 that the defendants "effected a settlement of the lawsuit" refers to the lawsuit described in paragraph 21, which was filed on November 26, 1990. In this lawsuit, the Loes sought recovery of money loaned to David Hull. There is no factual allegation and no factual proof that the settlement of that lawsuit was the result of anything sent by the U.S. mail nor any matter transmitted by wire communication. There is no factual allegation nor any factual proof that the settlement of such lawsuit was the result of any conduct that was false, fraudulent, or misleading. There is no factual allegation and no factual proof that the insurance company that was the victim of the scheme to defraud alleged in subparagraphs one through 20 of Count 17 even knew of such settlement, much less that it was motivated to take any action based thereon. To the contrary, the record evidence in this case is clear and unequivocal that the insurance company had paid all sums of money which it intended to pay on the "fraudulent" claims submitted by the Loes for the 1990 flood damage by July 11, 1991, some 14 months prior to September 12, 1992, the date upon which the five-year statute of limitations cut off would be applicable. In my view, when the insurance company deposits into the registry of the court a sum of money which it considers to be full and final payment for all of the

-**42**-

costs and losses sustained in the 1990 flood damage at the Loes'
marina, the fraud and misrepresentations would be complete
regardless of whether the Loes ever withdrew the money from the
registry of the court or not.  Surely, actual receipt by a
defendant of the cash proceeds of his fraudulent conduct cannot be
an essential element of the offense; and "constructive receipt" by
the defendants of the cash proceeds by the placing of the funds in
the registry of the court as occurred in this case should start the
running of the statute of limitations.  All of the funds paid by
the insurance company on the basis of fraudulent loss claims were
deposited into the registry of the state court (a total of close to
$2 million), and all but $2,000 of that sum was withdrawn by the
defendants more than five years prior to the filing of the first
indictment in this case.  While it is true that the $2,000 was
disbursed from the registry of the court within five years prior to
the filing of the first indictment, I think even the majority would
agree with me that the facts clearly indicate that the defendants
had absolutely nothing to do with the delay in disbursement.  That
delay was the result of (1) errors and omissions on the part of the
state district court in framing the disbursal order, (2)
unauthorized decisions by the investment company holding the funds
to give greater weight to the state judge's language as to the
amount to be retained rather than the amount to be paid to the
defendants, and (3) a failure on the part of counsel for the

defendants to promptly call for a correction of this mathematical error.

With surprising candor, the government recognizes that the only way it can avoid application of the five-year statute of limitations to Count 17 is to persuade the Court that the conduct described in overt act 22 (i) constitutes an act by one or more of the defendants and (ii) constitutes an act "to effect the object of the conspiracy" alleged in Count 17. In my view, the conduct in overt act 22 was neither.

The case law precedents which should guide our determination are for the most part well established. In *Grunewald v. United States*, 353 U.S. 391 (1957), the Supreme Court clearly held that in order for the government to sustain a conviction for conspiracy against a statute of limitations defense, the government must prove that the conspiracy was still in existence as of the limitations bar date and that at least one overt act by a defendant was performed after that date. Likewise, the Supreme Court has clearly stated that when doubt exists about the statute of limitations in a criminal case, the limitations period should be construed in favor of the defendant. *See United States v. Habig*, 390 U.S. 222, 226-27 (1968). This rule of construction in favor of the defendant has been recently recognized by our Circuit in *United States v. Meador*, 138 F.3d 986 (5th Cir. 1998). The question of whether a prosecution is barred by the statutes of limitations is a question

of law, subject to plenary review on appeal in this Circuit. *United States v. Manges*, 110 F.3d 1162, 1169 (5th Cir. 1997).  In *Manges*, our Court stated:

> Shanklin claims that he was prosecuted in violation of the applicable five-year statute of limitations.  *See* 18 U.S.C. § 3282.  With respect to the conspiracy count only, we agree.  **Our review is plenary.**

*Id*. at 1169 (emphasis added).  The Supreme Court has also clearly held that "statutes of limitations normally begin to run when the crime is complete." *Pendergast v. United States*, 317 U.S. 412, 418 (1943).  And the text of the five-year statute (18 U.S.C. § 3282) expressly states that the five-year limit applies "except as otherwise expressly provided by law."  In light of these principles, the Supreme Court has held that "the doctrine of continuing offenses should be applied in only limited circumstances" and should not be reached unless the explicit language of the substantive criminal statute compels such a conclusion." *Toussie v. United States*, 397 U.S. 112, 114 (1970).  Finally, in *United States v. Marion*, 404 U.S. 307, 322 (1971), the Supreme Court stated that statutes of limitations,

> represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they "are made for the repose of society and the protection of those who may (during the limitation) ... have lost their means of defense."  These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a

> defendant's right to a fair trial would be
> prejudiced.

*Id*. (citation omitted).

In addition to the foregoing Supreme Court authority, we have clear holdings by panels of this Circuit to guide us in this case. In the early case of **United States v. Davis**, 533 F.2d 921 (5th Cir. 1976), our Court wrestled with a controversy very similar to the one in this case. In **Davis**, the indictment charged conspiracy to violate 18 U.S.C. § 1006 by agreeing to make false, fictitious, and fraudulent statements and representations to the Department of Labor Manpower Administration, an agency of the United States Government. Only two of the eight overt acts set forth in the indictment were alleged as occurring within the five-year period of the statute of limitations. The defendant in **Davis** asserted that the two overt acts which happened within the five-year limitations period did not constitute acts in furtherance of the conspiracy alleged and our Court agreed. Relying on most of the Supreme Court law referred to earlier, our Court concluded that the prosecution of Davis was barred by the statute of limitations and granted a judgment of acquittal.

Similarly, in **United States v. Manges**, *supra*, a panel of our Court addressed specifically the circumstances of a charge of conspiracy to violate the mail fraud statute against a defendant's contention that it was barred by the five-year statute of limitations. In reversing the conviction of the defendant on this

conspiracy count, our Court pointed out that the conspiracy statute (18 U.S.C. § 371) "explicitly provides that for the crime of conspiracy to be complete, one or more of the conspirators must have performed an act to bring about the object of the conspiracy. This language cannot be stretched to include the posting of a letter by a non-conspirator."

In my view, our Circuit holdings in *Davis* and *Manges*, provide much clearer and better instruction as to the disposition of this case now before us than does our holding in *United States v. Girard*, 744 F.2d 1170 (5th Cir. 1984), which is the centerpiece and corner-stone of the government's theory in this case. In *Girard*, the grand jury indicted the defendants for conspiring to defraud the United States in violation of 18 U.S.C. § 371. The indictment alleged that the scope of the conspiracy encompassed three purposes: (1) to secure the contract for Girard Plumbing; (2) to obtain Housing Authority funds under the contract; and (3) to conceal the fraudulent nature of the bidding from the appropriate authorities. The government asserted that the last payment due under the contract occurred on a date inside the five-year statute of limitations. In light of this payment, our Court concluded that the conspiracy continued until this last payment was received and that the acceptance of the last payment under the contract satisfied the requirement that an overt act in furtherance of the conspiracy occurred within the proscribed time frame.

I note that the majority does not say that they are bound by the prior decision in *Girard*, but merely categorize that decision as "instructive." I have no quarrel with our Court's holding in *Girard* based on the express circumstances described therein, but I disagree wholeheartedly with the majority's conclusion that it provides even "instructive" help in deciding the issue here in *Loe*. The distinctions between *Girard* and *Loe* are fundamental and significant. In *Girard*, the charge was conspiracy to defraud the United States directly under § 371; in *Loe*, the charge was conspiracy to commit mail fraud and wire fraud against a private insurance company. In *Girard*, there were express allegations of three purposes for the conspiracy which included receipt of the funds to be paid by the United States Government under the contract with Girard which was fraudulently secured; and such allegations tied in neatly with the fact of final payment by the United States Government to Girard on the contract within the five-year statute of limitations. I challenge my colleagues in the majority to find similar express allegations in the language of Count 17 of the indictment of this case. As I have described previously, in Count 17 there is nothing in the subparts thereof describing The Conspiracy, The Scheme to Defraud, and The Manner and Means which can be connected with or anticipates in any way the allegations in subpart 22 of the overt acts. Finally, in *Girard*, it is clear that the final payment on the contract came from the United States

Government agency that was the victim of the fraudulent bidding scheme. In contrast, here, it is clear even from the majority's opinion that the insurance company that was the target and victim of the alleged mail and wire frauds deposited a final payment into the registry of the court in the sum of $638,388.34 in July of 1991, some 14 months outside of the five-year limitations period, which started on September 11, 1992. And in March 1992, some six months outside of the limitations period, the state district court ordered that $624,867.79 be paid to the Loes, which was their true and rightful share of the insurance proceeds deposited into the registry of the court. The $2,000 which was ultimately distributed to Babo Loe as Trustee for Loe's Highport in January or February 1993, was a part of the sum previously ordered to be distributed in March 1992 by the district court. There is, therefore, no allegation in Count 17 and no proof thereof cited by the government that would indicate any payment by the insurance company that was the victim of the alleged frauds to the defendants during the five-year period of limitations.

For all of the foregoing reasons, I respectfully dissent from the portion of the majority opinion that affirms the convictions and sentences of the defendants relating to Count 17. In my view, Count 17 was clearly barred by the statute of limitations, and the convictions and sentences of defendants based on Count 17 should be vacated and set aside. For two of the defendants, Babo Loe and

Loe's Highport, Inc., vacation of these convictions and sentences would not produce any significant reduction in the sentences that they received under other convictions from this indictment. However, as to defendant, C. D. Loe, Jr., whose only conviction was under Count 17, vacation of the conviction and sentence on Count 17 would relieve him of being a convicted felon and the burden of having to respond in fines and restitution obligations after his release from prison.