In re George Merle BYRD, Debtor.

No. 98–02060–5–ATS.

United States Bankruptcy Court,
E.D. North Carolina,
Raleigh Division.

Nov. 16, 2000.

248

Jeffrey M. Seigle, Raleigh, NC, for debtor.

Terri L. Gardner, Raleigh, NC, Chapter 7 Trustee.

David M. Grogan, Charlotte, NC, for Circus Circus, Inc.

## ORDER DENYING MOTION FOR SANCTIONS

A. THOMAS SMALL, Bankruptcy Judge.

The matter before the court is chapter 7 debtor George Merle Byrd's motion to require Circus Circus Las Vegas and Caesar's Palace Casino (collectively, "the casinos"), both former creditors of the debtor, and the Clark County District Attorney's Office in Clark County, Nevada, to show cause why they have not violated the automatic stay and discharge injunction provisions of the United States Bankruptcy Code §§ 362(a) and 524(a)(2). A hearing was held in Raleigh, North Carolina on October 10, 2000. For the reasons that follow, the court finds that §§ 362(a) and 524(a)(2) have not been violated, and the debtor's request for sanctions will be denied.

## FACTS

In April of 1998, debtor George Merle Byrd presented one check for $3000 to Circus Circus Las Vegas and five checks in the amount of $5000 each to Caesar's Palace Casino in Las Vegas, Nevada. All of the checks were returned unpaid by Byrd's bank. The casinos notified the Clark County District Attorney's Bad Check Diversion Unit, which sent notices and warnings of prosecution to Byrd regarding the bad checks in July 1998. Byrd apparently did not respond to these notices.

On September 11, 1998, Byrd filed a petition for relief under chapter 7 of the Bankruptcy Code. He listed both casinos as creditors, and notice of the bankruptcy filing was given to both the casinos and the Clark County District Attorney's Office (hereinafter "Clark County"). On October 3, 1998, Clark County sent written notice to Byrd's attorney stating that it intended to proceed with criminal charges against Byrd, and informing him that although it was not the policy of Clark County's "Bad Check Collection Unit" to force restitution from offenders who obtain a stay of collection during bankruptcy proceedings, Byrd could avoid prosecution by paying full restitution and a processing fee. (Debtor's Ex. F.) On November 10, 1998, a warrant was issued for Byrd's arrest on charges of larceny arising from the bad checks. According to Clark County, bail was then set at $31,140.00 cash (the exact amount owing to the casinos, including fines) or a surety bond of ten times that amount. (Aff. of Daniel E. Ahlstrom at ¶ 10.)

Neither Circus Circus nor Caesar's Palace objected to the debtor's discharge or filed a complaint to determine the dischargeability of Byrd's debts, and on December 14, 1998, Byrd received his discharge.

On May 2, 2000, Byrd was involved in an automobile accident in Raleigh, Wake County, North Carolina. The Raleigh police ran a check on his license, the Clark County warrant was discovered, and he was arrested. Bail in the amount of $32,000 cash was set by a Wake County, North Carolina magistrate, and the Release Order specifically stated that "cash bond of $32,000 may be posted or subject may be released to Clark County, Nevada officials only." (Debtor's Ex. E.) The $32,000 cash bond required in Wake County is somewhat higher than the $31,140 bail required by Clark County, and the Wake County order includes no mention of a surety bond.

To get Byrd out of jail, Byrd's spouse collected $31,140 in personal and borrowed funds and wired that amount to the County of Clark District Attorney Check Restitution Trust Fund in Las Vegas. (Debtor's Exs. C, D.) Clark County then informed the Raleigh Police Department that Clark County would not extradite Byrd. It stated that Byrd had paid full bail and that it had started proceedings to quash the arrest warrant and dismiss the case. (Debtor's Ex. E.) Clark County also gave notice to the Las Vegas Township court requesting that it "quash the Arrest Warrant, waive attendance of the Bad Check School, and request that the case be considered for dismissal. Restitution has been paid in full and the defendant resides out-of-state." (Debtor's Ex. E.) All of the foregoing events took place on May 2, 2000. Subsequently, the funds recovered by Clark County were paid to Circus Circus Las Vegas and to Caesar's Palace Casino.

## DISCUSSION

Though the facts are simple, the issues raised by them are not. There are matters of interpretation pertaining to the Bankruptcy Code and far-reaching questions of federalism, comity, and application of the *Younger* doctrine. Clark County argues that exercise of the court's equita-ble powers would infringe on state sovereignty and Eleventh Amendment immunity. And on a more basic level, the parties disagree about what constitutes restitution as compared to outright debt collection, and whether restitution should even be available. Though these issues are diverse, they arise fairly frequently in bankruptcy, and often are packaged together in much the same way as in this case. There are many thoughtful treatments of these issues in the reported decisions of other courts, but no clear path through the conflicting precedents. The precise issues raised by the facts of this case appear not to have previously arisen in this circuit.

Byrd argues that the casinos and Clark County violated the discharge injunctions of 11 U.S.C. § 524(a) and the automatic stay provisions of 11 U.S.C. § 362(a)(1), and seeks to recover from Clark County and the casinos the $31,140 wired by his wife to Clark County and then paid over to the casinos, as well as his attorney's fees and punitive damages. According to Byrd, Clark County's recovery of the amount owing to the casinos, plus fines, constituted the collection of a discharged debt for the benefit of the casinos.

Clark County makes a number of arguments in response. It claims that Byrd "requested" participation in Nevada's deferred prosecution program rather than return to Nevada to stand trial, and that § 362(b)(1) of the Bankruptcy Code, which exempts from the automatic stay the commencement or continuation of a criminal action or proceeding against the debtor, specifically authorized its ongoing prosecution of Byrd. Clark County was "not attempting to collect a debt, dischargeable or otherwise," it claims; "[i]nstead, the District Attorney [was] seeking to punish and rehabilitate Byrd because he committed a crime." (Clark County Br. at 5–6.) The County argues further that the *Younger* abstention doctrine prevents this court from enforcing the discharge injunction, and that even if *Younger* does not apply, Byrd cannot show that the "primary pur-

pose" of the prosecution was to serve as a debt collection device. Finally, Clark County contends that the District Attorney's Office has absolute immunity from claims for monetary damages or penalties, and that the office also is protected from lawsuits by the Eleventh Amendment.

## A. Bankruptcy Code §§ 362(b)(1) and 524(a)(2)

Section 362(b)(1) of the Bankruptcy Code provides that the filing of a bankruptcy petition does not stay "the commencement or continuation of a criminal action or proceeding against the debtor." 11 U.S.C. § 362(b)(1). A discharge, however, "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . ." 11 U.S.C. § 524(a)(2).

The apparent dichotomy between these statutes is obvious, given that many criminal actions are prompted by a debtor/defendant's failure to pay a debt. In the court's view, however, they can in this instance be reconciled. Moreover, the court concludes that these statutes authorize not only the commencement or continuation of the criminal action by Clark County against Byrd, but also Clark County's recovery of the discharged debts for the purpose of providing restitution to the casinos.

The most fundamental issue to be resolved in this matter is the role of a federal bankruptcy court in the context of a state criminal proceeding. The concerns that arise and the precedents that articulate them were succinctly recited in *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074 (9th Cir.2000) (en banc), as follows:

> We maintain the "deep conviction that federal bankruptcy courts should not invalidate the results of state criminal proceedings." *Kelly v. Robinson*, 479 U.S. 36, 47, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). This rule reflects a "fundamental policy against federal interference with state criminal prosecutions." *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). It also recognizes that "[t]he right to formulate and enforce penal sanctions is an important aspect of the sovereignty retained by the States." *Kelly*, 479 U.S. at 47, 107 S.Ct. 353.

*Gruntz*, 202 F.3d at 1084 (parallel citations omitted).

In *Gruntz*, the chapter 11 debtor failed to pay child support, prompting his ex-spouse to complain to the Los Angeles District Attorney. He was charged with and convicted of failure to support his dependent children. Gruntz was sentenced to jail, and then filed an adversary proceeding in the bankruptcy court arguing that the automatic stay should have precluded the criminal action because it was initiated for the purpose of debt collection. The court disagreed. It acknowledged that bankruptcy courts had developed an "array of tests for assaying any hint of a collector in the prosecutor's guise," but concluded that those efforts—and the court's own prior precedent—were simply "at odds with the plain words of the statute." *Id.* at 1085 & n. 10. The court concluded that "[i]nterpreting § 362(b)(1) as rendering the automatic stay . . . inapplicable to all criminal proceedings is consistent with 'the provisions of the whole law, and to its object and policy.'" *Id.* at 1085. The court also found no basis on which to differentiate between "economic and noneconomic ramifications of the debtor's criminal conduct." *Id.* at 1085–86.

Up to this point, this court agrees with the *Gruntz* court's reasoning. The court is mindful of the strong interests in state sovereignty, and of the many practical and theoretical pitfalls that arise when courts examine or challenge prosecutorial motive. In a proper case, of course, those examinations may be warranted; however, they may not be incorporated as a matter of course as a preliminary step a bankruptcy

court must take when considering state criminal matters prompted by a defendant's financial dealings.

■ The court acknowledges, then, that a state may initiate or continue criminal prosecutions regardless of the pendency of a bankruptcy case, and further that it may do so even when the state's—or a complaining witness's—primary purpose is the collection of a debt. However, a *creditor* does not have the full protection of § 362(b)(1), and an entity other than the government's prosecuting authority may not commence a criminal action for the primary purpose of recovering a debt that is dischargeable in bankruptcy. If a creditor already has brought its grievance to the attention of law enforcement officials prior to the debtor's bankruptcy filing, those officials may proceed as they deem appropriate and may elect to prosecute, or not.

■ The Supreme Court has "recognized that the States' interest in administering their criminal justice systems free from federal interference is one of the most powerful of the considerations that should influence a court considering equitable types of relief. *See Younger v. Harris,* 401 U.S. at 44–45, 91 S.Ct. at 750–51. This reflection of our federalism also must influence our interpretation of the Bankruptcy Code...." *Kelly,* 479 U.S. at 49, 107 S.Ct. 353. These interests are not in play, however, when a *creditor* seeks to recover a debt by initiating criminal processes after a debtor already has received the protection of the bankruptcy court. The bankruptcy proceedings offer ample protections for creditors who are owed monies due to larceny, fraud or other willful injury inflicted by the debtor. 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6); *see also In re Towers,* 162 F.3d 952, 956 (7th Cir. 1998) (en banc) (concluding that a restitution award to the state for the benefit of fraud victims was not excepted from discharge under § 523(a)(7), and that creditors instead should seek to have debts attributable to fraud, larceny, or willful

and malicious injury (which "cover the gamut of crimes") declared nondischargeable in the course of bankruptcy proceedings), *cert. denied, Illinois ex rel. Ryan v. Towers,* 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999).

■ A number of courts have recognized that criminal prosecution may violate § 524(a)(2) if the prosecution is motivated primarily by the creditor's desire to recover a debt. In *In re Daulton,* 966 F.2d 1025, 1028 (6th Cir.1992), for example, the court held that "[i]t is undisputed that the Bankruptcy Code precludes the use of criminal actions to collect debts that have been discharged in bankruptcy," but it accepted the creditor-bank's contention that it filed a criminal complaint after the debtor's discharge in bankruptcy in order to "make a statement to the farming community" regarding the debtor's fraudulent sale of his crops. Other courts apply the "principal motivation" test, which holds that a bankruptcy court may enjoin proceedings when it is " 'clear that the princip[al] motivation is neither punishment nor a sense of public duty, but rather to obtain payment of a dischargeable debt either by an order of restitution or by compromise of the criminal charge upon payment of the civil obligation.' " *In re Wise,* 25 B.R. 440, 442 (Bankr.E.D.Va. 1982) (internal quotations omitted) (adopting "principal motivation" test and noting that in bad check cases, the courts may issue an injunction to "protect the integrity of the bankruptcy court" where the "real motive behind the prosecution was the collection of prepetition debts and not the vindication of public welfare").

■ The typical use of the "principal motivation" test generally involves some inquiry into both the complainant's and the prosecution's motives, and thus, in the view of an increasing number of courts, runs afoul of the Supreme Court's decision in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See, e.g., In re Starr,* 147 B.R. 380, 382 (Bankr.E.D.Va.

1991) (disagreeing with *Wise,* and observing that some courts find that the principal motivation test fails to meet the "bad faith" test articulated in *Younger* ). In *Starr,* the prosecuting witness initiated a felony prosecution of Starr for the sole purpose of obtaining an order of restitution. *Id.* at 381. The *Starr* court declined to apply the principal motivation test used in *Wise* and instead turned directly to an analysis under *Younger v. Harris. Younger* established a three-part test to determine under what circumstances a federal court may enjoin a state court proceeding.

First, the state court action must be brought in bad faith or for harassment or under extraordinary circumstances. Second, the party requesting federal court intervention must stand to suffer a great and immediate irreparable harm to federally protected rights. Finally, this harm must be such that it cannot be eliminated by a defense against the criminal prosecution.

*Starr,* 147 B.R. at 382 (construing *Younger,* 401 U.S. at 46, 91 S.Ct. 746).

██ In this case, the court finds no factual basis sufficient to invoke either an analysis under *Younger* or application of the principal motivation test. The filing of a bankruptcy action should have no impact on whether a prosecuting entity elects to commence or continue a criminal action against a debtor, even if the action is based on a debt that will be dealt with in the bankruptcy case. A bankruptcy filing does, however, preclude a *creditor* from seeking to pursue criminal charges against a debtor for the primary purpose of attempting to recover a debt. Any effort to do so would violate the automatic stay and, potentially, the discharge injunction provisions of §§ 362(a) and 524(a)(2).

Practically speaking, the import of the court's decision is that once a debtor files a petition for bankruptcy, a disgruntled creditor may not then approach a governmental prosecutorial entity in order to prompt a criminal action to recover the debt. If the creditor already has complained to authorities by the time a petition is filed, those authorities may commence or continue a criminal prosecution, even one intended to result in direct restitution to the victim/creditor, as they see fit. But if the debtor files for bankruptcy before a creditor complains to prosecuting authorities, that complaint—though it may still, in the discretion of prosecutors, result in a criminal prosecution—may constitute a violation of the automatic stay or discharge injunction. *Cf.* § 524(a)(2) (enjoining the use of actions to collect debts after discharge). Neither the statutory injunction nor this holding restrict a creditor's "rights" in any way. Creditors can protect themselves in bankruptcy proceedings, and in many instances may be able to have the debt declared nondischargeable as being based on fraud, larceny, or willful injury. *See* §§ 523(a)(2), 523(a)(4), 523(a)(6). Creditors may claim no inalienable right to pursue a criminal action for the purpose of collecting a debt dischargeable in bankruptcy.

## B. Applicability of Bankruptcy Code § 523(a)(7)

Having concluded that the continued criminal prosecution of Byrd by Clark County was lawful, the court turns next to § 523(a)(7) of the Bankruptcy Code and to the relevant Nevada statutes. Section 523(a)(7) provides that a discharge under chapter 7 does not discharge a debtor from any debt "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss." 11 U.S.C. § 523(a)(7).

The Nevada statute under which Byrd was charged provides, in relevant part, as follows:

1. Except as otherwise provided in this subsection and subsections 2 and 3, a person who willfully, with an intent to defraud, draws or passes a check or draft to obtain:

. . .

(e) Credit extended by any licensed gaming establishment, drawn upon any real or fictitious person, bank, firm, partnership, corporation or depository, when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon its presentation, is guilty of a misdemeanor. If that instrument, or a series of instruments passed in the state during a period of 90 days, is in the amount of $250 or more, the person is guilty of a category D felony and shall be punished as provided in NRS 193.130. In addition to any other penalty, the court shall order the person to pay restitution.

Nev.Rev.Stat. § 205.130 (1999).

Byrd was charged with a violation of that statute, but was not actively prosecuted under it. Instead, Clark County explains, he paid restitution pursuant to a "deferred prosecution program." *See* Nev. Rev.Stat. § 205.466 (authorizing creation of restitution programs in the office of the district attorney). In response to Byrd's contention that the program is merely a form of governmental debt collection, Clark County makes these arguments:

> "Persons are not automatically admitted into the deferred prosecution program. They must meet specific criteria to be accepted into the program. [T]he accused is accepted into the deferred prosecution program upon the accused doing, among other things, making full restitution to the victim, completing the bad check school, and paying various fees."

(Clark County Br. p. 2 (citing Nev.Rev. Stat. § 205.466.))

At the outset, the court observes that this characterization of the program is wholly untenable. The record makes clear that the only "criteria" for acceptance into the program, which is run not through the Nevada state courts but rather by the district attorney's office and other law enforcement agencies or even private contractors of the district attorney's choosing, *see* Nev.Rev.Stat. § 205–466(1), was the payment of full restitution to Byrd's former creditors, through Clark County's trust fund. The court gives no credence to Clark County's argument that "Byrd *voluntarily* chose to enter the deferred prosecution program." (Clark County Br. p. 7 (emphasis in original).) The court finds further that Byrd was automatically admitted into the "program" as a matter of course, and that payment of the discharged debts and accompanying fines was the single criteria for "admittance." Moreover, the money could come from any source. The fact that Byrd's spouse was able to come up with the bail amount while her husband waited in jail serves no rehabilitative purpose whatsoever. Real rehabilitative measures involve flexibility, thought, and some personalization dependent not only on what a victim lost, but on what a particular offender should do to make amends. Requiring Byrd to pay a certain amount each month, based on his circumstances, conceivably could serve a rehabilitative purpose; requiring him to find it immediately or stay in jail, does not.

That said, the court does conclude that Clark County was not precluded by law from taking the actions described above. The court includes comment on them here because the County's actions are troubling, and its lack of candor regarding the purposes of its prosecution, or "deferred prosecution," of Byrd warrants mention.

■ The court concludes that under *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), and the precedent developed on this point in this circuit, a governmental entity is entitled to commence or continue a criminal prosecution against a debtor even if the prosecution is based upon a debt that could be discharged in bankruptcy, and even if the prosecuting entity intends to pass recovered monies on to the complaining victim/creditor in the form of restitution. As the *Kelly* Court explained:

> Although restitution does resemble a judgment "for the benefit of" the victim,

the context in which it is imposed undermines that conclusion. The victim has no control over the amount of restitution awarded or over the decision to award restitution. Moreover, the decision to impose restitution generally does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant.

*Id.* To be sure, *Kelly* is not on all fours with this case. The Connecticut statute at issue in *Kelly* "d[id] not require imposition of restitution in the amount of the harm caused. Instead, it provide[d] for a flexible remedy tailored to the defendant's situation." *Id.* at 53, 107 S.Ct. 353. Accordingly, the Court reasoned, discharging the restitution order "would hamper the flexibility of state criminal judges in choosing the combination of imprisonment, fines, and restitution most likely to further the rehabilitative and deterrent goals of state criminal justice systems." *Id.* at 49, 107 S.Ct. 353; *see also, e.g., United States v. Prodan,* 181 B.R. 279, 281 (E.D.Va.1995) (finding restitution order not dischargeable because it represented a " 'flexible remedy tailored to the defendant's situation' rather than an exact accounting of the harm caused" and was to the benefit of a governmental unit).

 In this case, Byrd was prompted under pressure to pay an amount equivalent to the debt to the casinos plus fines, without having benefit of judicial overview or discretion. The restitution paid by Byrd was not part of a criminal sentence handed down by a court, as was the case in *Kelly.* Byrd was, however, entitled to judicial overview and discretion, and would have had it if he had elected to defend the charges against him in a Nevada court. The court concludes that the fact that the restitution was paid by Byrd on short notice and without the exercise of judicial oversight is the price Byrd paid for sending in payment rather than staying in jail pursuant to a lawful warrant.

The court makes no criticism in this order of the Nevada statute's requirement of restitution in the event of a conviction under Nevada Revised Statute § 193.130. The determination that restitution should be a mandatory aspect of a convicted defendant's sentence is well within the policy-making role of the Nevada legislature. The *Kelly* Court specifically recognized the State's varying interests in incorporating restitution into its sentencing options:

Because criminal proceedings focus on the State's interests in rehabilitation and punishment, rather than the victim's desire for compensation, we conclude that restitution orders imposed in such proceedings operate "for the benefit of" the State. Similarly, they are not assessed "for ... compensation" of the victim. The sentence following a criminal conviction necessarily considers the penal and rehabilitative interests of the State. Those interests are sufficient to place restitution orders within the meaning of § 523(a)(7).

*Id.* at 53, 107 S.Ct. 353.

 In this circuit, the court of appeals has dealt generally with exclusions from discharge under § 523(a)(7), but has not had occasion to examine the statute in the context of comparable facts. The Fourth Circuit recently has made clear, however, that "a sanction must be penal to be exempt from discharge under § 523(a)(7)." *In re Collins,* 173 F.3d 924, 932 (4th Cir. 1999), *cert. denied sub nom Virginia v. Collins,* 528 U.S. 1079, 120 S.Ct. 785, 145 L.Ed.2d 663 (2000). The *Collins* court interpreted *Kelly* as holding that "restitution ordered by a court as part of a criminal sentence is nondischargeable under § 527(a)(7)," because the " 'decision to impose restitution does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant.' " *Id.* at 931 (quoting *Kelly,* 479 U.S. at 52, 107 S.Ct. 353). The court noted that it previously had "applied this same reasoning" in *In re Thompson,* 16 F.3d 576 (4th Cir.1994), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2709, 129 L.Ed.2d 836 (1994), wherein it found that court costs assessed

against a defendant upon conviction were nondischargeable. *Id.*

The *Collins* court did not refer to another recent Fourth Circuit decision, *U.S. Dept. of Housing & Urban Development v. Cost Control Marketing & Sales Management of Va., Inc. (CCMV),* 64 F.3d 920 (4th Cir.1995), *cert. denied sub nom. CCMV v. Cisneros,* 517 U.S. 1187, 116 S.Ct. 1673, 134 L.Ed.2d 777 (1996), in which the court appeared to apply a broader construction of § 523(a)(7) than appears in *Kelly.* In *CCMV,* the court held that the defendants, who had engaged in repeated actions in contempt of court and bilked investors out of many millions of dollars, could not discharge in bankruptcy the judgment ordering them to disgorge their ill-gotten profits to HUD. The court noted that the disgorgement order was part of the equitable relief awarded to HUD, and concluded that it came within the meaning of § 523(a)(7) even though HUD specifically intended to disburse some or all of those monies to *CCMV*'s victims. *Id.* at 927. The court concluded that "so long as the government's interest in enforcing a debt is penal, it makes no difference that injured persons may thereby receive compensation for pecuniary loss." *Id.* at 928. The *CCMV* court also interpreted the "not compensation for pecuniary loss" phrase in § 523(a)(7) to "refer[ ] to the government's pecuniary loss." *Id.*

▮▮▮ In sum, under *Kelly* and the limited precedent developed thus far in this circuit, the court concludes that the restitution and fines Byrd paid were, pursuant to the Nevada statute, within the "fine, penalty or forfeiture" language of § 523(a)(7). It is clear that a restitution award can be payable "to and for the use of the governmental unit" even if the government receives the money and then disburses it to victims. *See CCMV,* 64 F.3d at 927–28. The *CCMV* decision also makes clear that the "not compensation for pecuniary loss" language precludes compensation for governmental pecuniary loss,

which is not at issue in this case. *Id.* at 928.

The court acknowledges that other courts have developed a more restrictive view of when a restitution award is nondischargeable under § 523(a)(7). *See, e.g., In re Towers,* 162 F.3d at 956 (concluding that a restitution order entered after a civil proceeding under Illinois' Consumer Fraud Act was dischargeable because it was not literally payable to and for the benefit of the government); *In re Rashid,* 210 F.3d 201, 208 (3rd Cir.2000) (adopting the *Towers* court's reasoning and concluding that "[t]he word 'payable' clearly casts an economic light over the phrase that suggests that the benefit must be conferred from the monetary value of the debt to be paid by the defendant and not the more abstract benefit of criminal deterrence."). There is no clear path through the conflicting precedents addressing these issues, and no decision that deals squarely with the questions raised by this case. As noted earlier, the facts before the court differ in significant ways from those in the precedents that the court adopts as either controlling or persuasive: The restitution paid by Byrd was not imposed as part of a sentence handed down by a court or even considered by a court, for example, though the imposition of restitution by a court exercising discretion was of no small import to the *Kelly* Court. *See Kelly,* 479 U.S. at 52–53, 107 S.Ct. 353. Restitution was required by statute in this case, which further curtails flexibility; in *Kelly,* it was not. *Id.* And, of course, the statutes themselves invite disagreement as to whether, and if so what sort of, criminal prosecutions may be enjoined or restitution orders approved.

**C. Applicability of the *Younger* Abstention Doctrine, Prosecutorial Immunity and the Eleventh Amendment**

There is no pending state criminal prosecution subject to injunction under § 105(a), and the court did not "restrain a

state criminal prosecution," which was the challenged action in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). This proceeding also does not qualify as a suit against one of the United States. On those grounds and in light of the court's ruling, the court sees no basis on which to address abstention issues or either of Clark County's claims of prosecutorial immunity or the immunity of that office under the Eleventh Amendment.

## CONCLUSIONS

The court concludes that governmental prosecutors may initiate and continue criminal prosecutions without violating the automatic stay even if, as in this case, the primary purpose of the prosecution is to collect a dischargeable debt. Accordingly, the request for sanctions against the Clark County District Attorney's Office is **DENIED.**

The court finds further that a creditor or other entity (other than a governmental prosecutor) violates the stay if it initiates criminal proceedings after a bankruptcy petition is filed and if the primary purpose is to collect a dischargeable debt. In this case, there was no violation because the casinos initiated the proceedings prior to Byrd's bankruptcy filing. After this matter had been called to the attention of the district attorney's office, the decision whether to commence or continue the prosecution rested with the prosecutors, and the casinos were not in violation of the stay even if the continued prosecution was for the primary purpose of collecting the debt owed to them. Accordingly, the request for sanctions against Circus Circus Las Vegas and Caesar's Palace Casino is **DENIED.**

Finally, restitution arising from a criminal prosecution as discussed herein is nondischargeable. Consequently, the creditors need not disgorge the funds that they received from the restitution paid by Byrd through Clark County. Accordingly, the request that the creditors disgorge the funds they received is **DENIED.**

**SO ORDERED.**