# United States Court of Appeals
## For the First Circuit

No. 03-2444

IN RE JUDITH A. McMULLEN,
Debtor,

JUDITH A. McMULLEN,
Plaintiff, Appellant,

v.

LORI SEVIGNY, RICHARD F. SEVIGNY, JOHN WILLIAMS,
AND CURTIS PERRY,
Defendants, Appellees,

MICHAEL J. McGLONE,
Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Reginald C. Lindsay, U.S. District Judge]

Before
Boudin, Chief Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.

Gordon N. Schultz, with whom Schultz & Company was on brief
for appellant.
Gary W. Cruickshank, for appellee Curtis Perry.
John Williams, on brief pro se.
Mary Alice McLaughlin, with whom Michael J. McGlone and Folan
& McGlone, P.C. were on brief for appellees Lori and Richard
Sevigny.

October 20, 2004

**CYR**, <u>**Senior Circuit Judge**</u>.  Chapter 13 debtor Judith A. McMullen challenges a bankruptcy court ruling that the postpetition complaints lodged against McMullen, in the Massachusetts Superior Court and with the Massachusetts Division of Registration for Real Estate Agents, by the four defendants-appellees did not contravene the automatic stay provisions of Bankruptcy Code § 362.  Discerning no error, we affirm.

**I**

<u>**BACKGROUND**</u>

The case stems from an acrimonious real estate transaction which originated in 1997, when Lori Sevigny entered into an agreement with Lester Pryor, a trustee employed by the estate of one Mary Perry, to purchase a parcel of real estate located in Rochester, Massachusetts.  McMullen, a licensed real estate agent, acted as the broker for the transaction, and accepted a $10,200 deposit from Lori Sevigny and her husband Richard.  Subsequently, the sale fell through, and eventually the property was purchased by a corporation controlled by McMullen's father. The deposit was never returned to the Sevignys, and McMullen insists that she did not have possession of it.

In January 2000, McMullen initiated chapter 7 proceedings.  Roger Stanford, Esq., the attorney for the Sevignys, filed a nondischargeability complaint in the chapter 7 case, alleging that McMullen fraudulently retained their $10,200 deposit.

In her amended creditor matrix, McMullen listed the Sevignys as creditors, but incorrectly listed their address as 723 Snipatuit Road, rather than 732. On June 13, 2000, Stanford sent the Sevignys a letter, explaining that McMullen had submitted an answer to their nondischargeability complaint, but that her bankruptcy case was being converted from chapter 7 to chapter 13. The Sevignys mistakenly understood the letter to mean that McMullen was withdrawing her chapter 7 petition, thus terminating her bankruptcy case, but that she might commence a new chapter 13 proceeding in the future. For the next six weeks the Sevignys repeatedly – though unsuccessfully – attempted to contact Stanford to confirm their understanding of the status of the McMullen bankruptcy proceeding.

On July 10, 2000, a formal notice of the conversion of the McMullen case was mailed to the Sevignys by the bankruptcy court, and Stanford dismissed the nondischargeability complaint. Thereafter, the Sevignys discharged Stanford as their attorney, purportedly for failing to keep them informed about litigation matters. Stanford nonetheless failed to withdraw from the bankruptcy court proceeding. The Sevignys consulted briefly with another bankruptcy lawyer, but did not retain an attorney.

Instead, on July 27, 2000, Lori Sevigny submitted a complaint against McMullen before the Massachusetts Division of Registration for Real Estate Agents, claiming that the $10,200

deposit had been fraudulently retained by McMullen. Lori provided the Board with a copy of the 1997 purchase and sales agreement expressly designating McMullen as the custodian of the deposit, as well as a copy of her canceled check for the deposit, which listed an account number and had been endorsed by the seller, Lester Pryor, but which was not endorsed by McMullen. Absent any evidence that McMullen had ever had the deposit, the Division dismissed the Sevigny complaint.

In September 2000, Curtis Perry (hereinafter: "Perry"), Mary Perry's son and heir, who had held an interest in the Rochester property, decided to assist the Sevignys in reclaiming their deposit by procuring an affidavit from Lester Pryor, supporting Perry's suspicion that McMullen had (i) shortchanged his mother's estate by selling the property to McMullen's father's corporation for an amount less than the Sevignys' offer, and (ii) wrongfully retained the Sevignys' $10,200 deposit. Perry, and his friend and attorney John E. Williams, procured the Pryor affidavit, which asserted that McMullen (and not Pryor) had received and appropriated the deposit to her own use.

On November 6, 2000, the Sevignys retained a new attorney, Michael McGlone, Esq., who commenced suit against McMullen in state superior court to recover the $10,200. Both Perry and Williams were aware of McMullen's pending chapter 13 case and the resultant automatic stay, but neither informed Richard

Sevigny or McGlone. Five weeks later, as soon as McMullen had notified them of the automatic stay, the Sevignys promptly dismissed the superior court complaint.

On December 1, 2000, McMullen commenced the instant adversary proceeding, alleging that (i) the Sevignys violated the automatic stay by submitting a complaint with the Division of Registration for Real Estate Agents, and (ii) Perry and Williams had aided and abetted the Sevignys, in filing the collection action in the superior court notwithstanding the automatic stay. Following trial, the bankruptcy court entered its unpublished decision, granting judgment for the defendants on all counts. On appeal, the district court affirmed the bankruptcy court, without opinion, and McMullen now appeals.

**II**

**DISCUSSION**

**A.** **The Complaint Submitted to**
**the Division of Registration**

McMullen first contends that the bankruptcy court misapplied Bankruptcy Code § 362(b)(4) in determining that the complaint submitted by the Sevignys before a state regulatory agency – <u>viz.</u>, the Board of Registration – could never, as a matter of law, constitute a violation of the automatic stay. She cites authority which states that the bankruptcy court must assess each state agency proceeding on a case-by-case basis in order to determine, <u>inter alia</u>, (i) whether the state places such importance

-6-

upon the particular regulatory scheme at issue as to outweigh the public policy objectives sought to be served by the automatic stay, and (ii) whether the creditor knew of the pending bankruptcy case, yet either intentionally or in bad faith sought to employ the regulatory proceeding as an end-run to collect its disputed claim outside of bankruptcy. McMullen suggests that the bankruptcy court in this case failed to undertake the requisite fact-specific inquiry.

Following an intermediate appeal to the district court, the findings of fact arrived at by the bankruptcy court are independently reviewed by the court of appeals for clear error; its conclusions of law de novo. See In re Charlie Auto Sales, Inc., 336 F.3d 34, 37 (1st Cir. 2003).

Subsection 362(a) of the Bankruptcy Code ordains that a bankruptcy petition shall operate as an automatic stay of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor." Bankruptcy Code § 362(a)(1); 11 U.S.C. § 362(a)(1). By thus safeguarding the debtor estate from piecemeal dissipation, the automatic stay efficiently ensures that the assets remain within the exclusive jurisdiction of the bankruptcy court pending their orderly and equitable distribution among the creditors, better enabling the debtor's "fresh start." See In re Jamo, 283 F.3d 392, 398 (1st Cir. 2002) ("The automatic

-7-

stay is one of the fundamental protections that the Bankruptcy Code affords to debtors.").

Nonetheless, although the Code accords broad scope to the automatic stay, it expressly excepts certain postpetition proceedings from the operation of the stay, including any action brought before a governmental regulatory agency to enforce its police or regulatory powers. See Bankruptcy Code § 362(b)(4), 11 U.S.C. § 362(b)(4). This exception discourages debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct which would seriously threaten the public safety and welfare (e.g., environmental and/or consumer protection regulations). See In re First Alliance Mortgage Co., 263 B.R. 99, 107 (BAP 9th Cir. 2001) (noting that fundamental policy of § 362(b)(4) is to "prevent[] the bankruptcy court from becoming a 'haven for wrongdoers'") (citation omitted); see also H.R. Rep. No. 95-595, pt. 1, at 343 (1977); S. Rep. No. 95-989, pt. 2, at 51-52 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5836, 5963, 6299. Nevertheless, given the expansiveness of subsection 362(a), the exception contained in subsection 362(b)(4) is to be narrowly construed. See Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora (In re Corporacion de Servicios Medicos Hospitalarios de Fajardo), 805 F.2d 440, 447 (1st Cir. 1986).

-8-

To that end, the courts have devised two interrelated, fact-dominated inquiries – the so-called "public policy" and "pecuniary purpose" tests – for assessing whether a particular governmental proceeding comes within the subsection 362(b)(4) exception. See In re Spookyworld, Inc., 346 F.3d 1, 9 (1st Cir. 2003); Corporacion de Servicios, 805 F.2d 440, 445 n.4; In re Mohawk Greenfield Motel Corp., 239 B.R. 1, 6 (Bankr. D. Mass. 1999). These inquiries contemplate that the bankruptcy court, after assessing the totality of the circumstances, determine whether the particular regulatory proceeding at issue is designed primarily to protect the public safety and welfare, or represents a governmental attempt to recover from property of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties. See id.; In re Fitch, 123 B.R. 61, 63 (Bankr. D. Idaho 1991).

Tested against these criteria, there can be little doubt that the Board proceeding brought against McMullen in the instant case is excepted from operation of the automatic stay by virtue of Bankruptcy Code § 362(b)(4). The complaint alleged that McMullen, acting as a licensed real estate broker, improperly retained the cash deposit made by the Sevignys during the course of the aborted real estate transaction. State law expressly empowers the Board to suspend, revoke, or refuse to renew a real estate broker license where the broker has "failed, within a reasonable time, to account

-9-

for or remit any moneys belonging to others which have come into his possession as a broker or salesman." Mass. Gen. Laws ch. 112, § 87AAA(d); see 254 C.M.R. § 3.00(10)(a) ("[A] broker shall be responsible for such money until the transaction is either consummated or terminated, at which time a proper account and distribution of such money shall be made.").

Consequently, we next inquire whether subsection 362(b)(4) contemplates that the state power to regulate the licensure of real estate brokers is designed to advance a sufficiently important public policy so as to trump the competing interests fostered by the automatic stay. The state power of licensure, which safeguards the public from wrongful future conduct of corrupt or incompetent professionals, falls squarely within the purview of the subsection 362(b)(4) exception to the automatic stay. See S. Rep. No. 95-989, at 52 (1978), reprinted in 1978 U.S.C.C.A.N. 5838 ("[Section 362(b)(4)] excepts . . . governmental units . . . suing a debtor to prevent or stop violation of fraud, environmental protection, [or] consumer protection.") (emphasis added); see also, e.g., Thomassen v. Div. of Med. Quality Assurance (In re Thomassen), 15 B.R. 907, 909 (BAP 9th Cir. 1981) (observing that revocation of medical license for medical malpractice and professional incompetence protects public); Shapiro v. Dep'tal Disciplinary Comm. for the First Judicial Dep't (In re Friedman & Shapiro, P.C.), 185 B.R. 143, 145 (S.D.N.Y. 1995) (same, concerning

-10-

revocation of license to practice law); Fitch, 123 B.R. at 63 (noting that insurance license revocation proceedings were "designed to punish [the licensee] for his alleged fraudulent conduct, and to deter others from engaging in such activities, rather than to attempt to recover any alleged misappropriated funds or to recompense any insurers"); Christmas v. Md. Racing Comm'n (In re Christmas), 102 B.R. 447, 460-81 (Bankr. D. Md. 1989) (concerning revocation of horse trainer's license); Beker Indus. Corp. v. Fla. Land and Water Adjudicatory Comm'n (In re Beker Indus. Corp.), 57 B.R. 611, 631 (Bankr. S.D.N.Y. 1986) (involving revocation of license to transport phosphate rock). More specifically, these same policy considerations are cited in relation to the revocation or suspension of the licenses of real estate brokers or salesmen. See, e.g., Sam Daily Realty, Inc. v. Dep't. of Commerce and Consumer Affairs, State of Hawaii (In re Sam Daily Realty, Inc.), 57 B.R. 83, 85-86 (Bankr. D. Haw. 1985) (holding that state real estate commission's suspension of realtor's license and imposition of $5,000 fine were exempt from stay pursuant to § 362(b)(4), because the commission's "interest in this matter is in punishing misconduct and preventing future acts of the type [the licensee] has been accused"); cf. Granger v. Harris (In re Harris), 85 B.R. 858, 863 (Bankr. D. Colo. 1988) (same, distinguishing punitive fines against realtor from compensatory awards). Further, the Board's power to revoke or

-11-

suspend realtor licenses plainly implements Commonwealth policy. See <u>Greater Boston Real Estate Bd.</u> v. <u>Bd. of Registration of Real Estate Brokers & Salesmen</u>, 540 N.E.2d 1313, 1315 n.7 (Mass. 1989) ("The conduct described in [Mass. Gen. Laws ch. 112, § 87AAA(d)] clearly relates to discipline and to acts which are either criminal or <u>against</u> <u>public</u> <u>policy</u>.") (emphasis added).

Although it is conceivable that a state might assert a public-policy purpose in order to mask some improper pecuniary aim, <u>see</u> <u>In re North</u>, 128 B.R. 592, 602 (Bankr. D. Vt. 1991), most assuredly this case is <u>not</u> such an instance, since neither the Commonwealth nor the Board could have any conceivable pecuniary interest in property of the McMullen chapter 7 estate or chapter 13 estate. <u>See</u> <u>Spookyworld</u>, 346 F.3d at 9 (noting that government had no pecuniary interest in enforcing building code). Although it is alleged that the Sevignys harbored such a pecuniary interest in the recovery of their deposit from McMullen's funds, the suspension, revocation, or refusal to renew a real estate broker license are the <u>only</u> enumerated powers accorded the Board. <u>See</u> Mass. Gen. Laws ch. 121, § 87AAA(d).[1] Hence, the Board was neither empowered to

---

[1]McMullen cites cases which hold that a regulatory board or commission may award civil monetary penalties against a debtor without offending the automatic stay, provided the enabling statute or regulation so ordains, <u>see</u>, <u>e.g.</u>, <u>Poule</u> v. <u>Registrar of Contractors of State of Cal.</u> (<u>In re Poule</u>), 91 B.R. 83, 87 (BAP 9th Cir. 1988); <u>In re Synergy Dev. Corp.</u>, 140 B.R. 958, 961 (Bankr. S.D.N.Y. 1992), but otherwise a regulatory commission cannot order restitution, <u>see</u> <u>In re Dunbar</u>, 235 B.R. 465, 473 (BAP 9th Cir. 1999). From these authorities, McMullen would have us infer that

compel McMullen to repay the deposit to the Sevignys, nor to award any other restitutionary remedy. See id. ("Any person whose licensure is suspended or revoked shall also be liable to such other punishment as may be provided by law.").[2] Finally, even if the Board were so empowered, it did not order such relief, but instead ultimately dismissed the Sevigny complaint on the merits. Cf. Bd. of Governors of the Fed. Reserve Syst. v. McCorp. Fin., Inc., 502 U.S. 32, 41 (1991) (noting that order for money judgment may be entered in a proceeding, as long as it is not enforced, and the mere "possibility" that proceedings ultimately have some effect on the property of the bankrupt estate does not make subject to the automatic stay a proceeding which is otherwise exempt from stay under section 362(b)(4)). Thus, the disciplinary proceeding before the Board was designed to serve – and did in fact principally serve – to protect the public in the future, rather than to seek recompense for the alleged financial losses sustained by the

---

the absence of such authority in subsection 87AAA(d) means that the Sevignys' complaint did violate the stay. As the Board's powers extend neither to awards of monetary damages nor restitution, these citations are inapposite.

[2]The McMullen citation to In re Massenzio, 121 B.R. 688 (Bankr. N.D.N.Y. 1990), is inapposite, as the court there found that the state insurance department had agreed not to revoke the insurance license of the debtor's partner after he repaid premiums to their customers, and thus concluded that the state had commenced the revocation proceedings against the debtor and his partner in a veiled attempt to protect their customers' pecuniary interests, rather than to protect the public welfare. Thus, the proceedings were not exempt from the subsection 362(b)(4) stay. Id. at 692.

Sevignys.

Citing In re Byrd, 256 B.R. 246 (Bankr. E.D.N.C. 2000), McMullen maintains that the above-cited cases are apposite only if the proceedings are initiated by the government, whereas the Board proceedings commenced with the Sevignys' postpetition filing of a verified complaint.  See Mass. Gen. Laws ch. 121, § 87AAA.  In Byrd, the court stated that a private third party may lodge a prepetition criminal complaint against a debtor, and any post-petition proceeding on that complaint would still be exempt from the automatic stay under subsection 362(b)(4), even if the proceeding were designed to recover a private debt.  See Byrd, 256 B.R. at 251.  On the other hand, the court opined that once the bankruptcy petition has been filed the third party cannot approach governmental authorities with a complaint, and any proceedings based upon that postpetition complaint would be stayed.  Id.

Byrd is readily distinguishable.  First, the Byrd complaint involved a criminal proceeding, which implicated unique federal-court abstention issues.  See id. at 250 ("We maintain the 'deep conviction that federal bankruptcy courts should not invalidate the results of state criminal proceedings.'  This rule reflects a 'fundamental policy against federal interference with state criminal prosecutions.'") (citations omitted).

Even more importantly, the second prong of the Byrd rule – whether or not it offers a sound interpretation of subsection

-14-

362(b)(4) – is mere dicta, since the complainants in <u>Byrd</u> had lodged their complaint <u>before</u> the debtor filed for bankruptcy, and the court held that the proceedings on the complaint were <u>not</u> stayed. <u>Id.</u> at 256.[3] Thus, <u>Byrd</u> does not support the McMullen contention that postpetition proceedings initiated by a private party are outside the subsection 362(b)(4) exception to the automatic stay. <u>See</u> <u>Municipality of San Juan</u> v. <u>Rullan</u>, 318 F.3d 26, 28 n.3 (1st Cir. 2003) ("Dicta – as opposed to a court's holdings – have no binding effect in subsequent proceedings in the same (or any other) case.").

The last statement in <u>Byrd</u> is not only dicta, but in our view, overbroad. A private party's reporting of wrongful conduct to governmental regulatory authorities is neither the commencement of a proceeding under subsection 362(a)(1), nor necessarily an "act to collect" under subsection 362(a)(6). Although we broadly construe the automatic stay in many contexts, the same sound public policy reasons which undergird the subsection 362(b)(4) exception counsel against any rule which might dissuade private parties from providing governmental regulators with information which might

---

[3]The McMullen citation to <u>In re Pincombe</u>, 256 B.R. 774 (Bankr. N.D. Ill. 2000), is unavailing as well. There the court held that a private party had not violated the automatic stay by filing an employment discrimination complaint with the state anti-discrimination commission five months <u>before</u> the debtor filed the bankruptcy petition. <u>Id.</u> at 781. Although McMullen would have us indulge the negative inference that a similar postpetition complaint would violate the stay, the <u>Pincombe</u> court plainly and simply had no occasion to determine that matter.

require enforcement measures to protect the public from imminent harm. McMullen surmises that the Sevignys' Board complaint was motivated by their desire to force McMullen into repaying the alleged debt, but the Sevignys made no postpetition threat to file a complaint which might constitute an "act to collect" under § 362(a)(6), cf. In re Diamond, 346 F.3d 224 (1st Cir. 2003),[4] nor was the continued prosecution of the Board proceeding made contingent on whether McMullen repaid the deposit, cf. In re Massenzio, 121 B.R. at 692; see supra note 2.

Additionally, McMullen argues that even if these sorts of professional licensing proceedings normally are not stayed by subsection 362(b)(4), the instant case differs in that the Sevignys submitted their complaint in bad faith. Although we have yet to decide this issue on its merits, we have noted in dicta the tenuousness of the arguments for engrafting such a "bad faith" exception onto subsection 362(b)(4), noting the emergent rule that "bankruptcy courts should not inquire into the 'legitimacy' of

---

[4]In re Diamond held that a creditor violated the automatic stay by informing the debtor, during settlement negotiations in a nondischargeability proceeding in the bankruptcy court, that the creditor immediately would file a complaint with the state real estate commission to revoke the debtor's real estate license unless the debtor agreed to settle. Id. at 227 (finding that creditor's threat constituted "impermissible 'coercion or harassment'" under § 362(a)(6)). The instant case is factually distinguishable, since (1) the Sevignys never expressly conditioned their filing of a Board complaint on McMullen's refusal to repay the deposit; and (2) In re Diamond did not involve a creditor's action in commencing a proceeding otherwise exempt from the automatic stay pursuant to subsection 362(b)(4).

-16-

ongoing administrative enforcement proceedings in determining whether the police power exception applies to them." See Spookyworld, 346 F.3d at 9-10 & n.5 (noting that plaintiff alleged that government acted vindictively in closing down its park due to fire code violations) (citing In re Javens, 107 F.3d 359, 365-67 & n.6 (6th Cir. 1997)); see also Beker Indus. Corp., 57 B.R. at 631. Whether or not bad faith is alleged on the part of the regulators or of the complainants, such an exception would immerse the bankruptcy courts in "'mini-trials of purely state regulatory issues,'" which are far better left to the state courts through recourse to available state-law remedies. See Spookyworld, 346 F.3d at 9-10.

In any event, even if we were to decide, as a matter of law, that a "bad faith" exception is available, the record facts in the instant case amply warrant the bankruptcy court finding of fact that the Sevignys did not submit their Board complaint in bad faith. Whether a party has acted in bad faith constitutes a quintessential issue of fact, which must be determined by the factfinder following an examination of the totality of the circumstances. See Official Unsecured Creditors Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1316-17 (1st Cir. 1993) ("The bankruptcy court, not the district court or court of appeals, is the only tribunal equipped to make evidentiary findings on relevant factual matters such as whether the parties acted in bad faith.");

<u>Palmacci</u> v. <u>Umpierrez</u>, 121 F.3d 781, 788-89 (1st Cir. 1997); <u>In re Harris</u>, 279 B.R. 254, 262 (BAP 9th Cir. 2002).  The findings of fact determined by the bankruptcy court are reviewed for clear error only, with "'due regard . . . to the opportunity of the bankruptcy court to judge the credibility of witnesses,'" <u>In re Carp</u>, 340 F.3d 15, 21-22 (1st Cir. 2003) (citation omitted). <u>See</u>, <u>e.g.</u>, <u>N. Light Tech., Inc.</u> v. <u>N. Lights Club</u>, 236 F.3d 57, 64 (1st Cir. 2001) (undertaking "clear error" review of "bad faith" finding).  Accordingly, such findings of fact are not to be disturbed if "supportable on any reasonable view of the record," <u>viz.</u>, "'unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'"  <u>Carp</u>, 340 F.3d at 22 (citations omitted).

McMullen points to the following record evidence, as compelling a finding that the Sevignys acted in bad faith, <u>inter alia</u>: the Sevignys (i) did not inform the Board regarding McMullen's pending chapter 13 case; (ii) falsely alleged before the Board that McMullen (rather than Lestor Pryor) had received and held their deposit; and (iii) gave the Board only the 1997 purchase and sales agreement, which named McMullen as the escrow agent, and did not submit the 1998 superseding agreement, which named a different agent.  None of the record evidence cited by McMullen even remotely suffices to establish clear error.

First, the bankruptcy court explicitly held that the

-18-

Sevignys did not conceal the McMullen bankruptcy case from the Board. The Sevignys testified at the bench trial that the reason they did not inform the Board of the McMullen bankruptcy was that they believed at the time they filed their Board complaint that the McMullen bankruptcy proceedings were no longer active. The Sevignys also testified that: (i) they did not understand how their deposit, which McMullen simply held in escrow, could become property of her bankrupt estate;[5] (ii) they interpreted their attorney's June 13, 2000 notification – that the McMullen chapter 7 case was being converted to chapter 13 – to mean that the McMullen bankruptcy case was being withdrawn, viz., that it was being terminated; (iii) they were unable to contact their attorney after receiving his letter to ask him followup questions, and eventually had to discharge him; (iv) they received no further notices from the bankruptcy court, possibly because the creditor matrix in the McMullen bankruptcy case did not list their correct address; and (v) neither Richard not Lori Sevigny is an attorney, nor are they otherwise knowledgeable about bankruptcy law or terminology.

Second, the Sevignys testified that at the time they

---

[5]In some circumstances, courts have held that a transgression of the automatic stay, undertaken in the well-grounded and "good faith" belief that the stay was inapplicable to the disputed property, cannot support a claim for damages under Bankruptcy Code § 362(h). See, e.g., Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1071 (3d Cir. 1992); United States v. Inslaw, 932 F.2d 1467, 1472 (D.C. Cir. 1991).

filed their complaint with the Board they did not know that Lester Pryor had their deposit. The reverse side of the deposit check did reflect that Pryor had endorsed the check, and listed an account number, but the Sevignys had no way of knowing that the listed bank account was that of Pryor, and they assumed that Pryor might have endorsed the check and that McMullen had deposited it into the escrow account without adding her own endorsement. Indeed, the purchase and sales agreement designated McMullen as the custodian of the deposit.

Finally, Richard Sevigny testified that he submitted the original purchase and sales agreement to the Board in the belief that it contained the same terms as the superseding purchase and sales agreement, that he had not realized that the superseding agreement contained the new term which designated a "United Realty" as the escrow agent, and hence that he had not acted with any intent to conceal that provision from the Board.

As each of these findings turns primarily upon the factfinder's assessment of the credibility of the Sevignys' plausible explanations, we can discern no clear error on the present record. See Carp, 340 F.3d at 21-22. Thus, even if we were to assume that subsection 362(b)(4) might allow for a "bad faith" exception, the McMullen claim must fail.

-20-

**B.  The Superior Court Action**

**1.  Willfulness of the Sevignys' Violation**

McMullen next contends that the bankruptcy court erred in holding that the Sevignys' state superior court complaint against McMullen was merely a technical violation of the automatic stay, rather than a willful violation compensable under Bankruptcy Code § 362(h).  Once again we must disagree.

Under Bankruptcy Code § 362(h), a violation of the automatic stay must be "willful" or the violator cannot be held liable for damages.  Bankruptcy Code § 362(h); 11 U.S.C. § 362(h). Generally speaking, a violation will be found "willful" if the creditor's conduct was intentional (as distinguished from inadvertent), and committed with knowledge of the pendency of the bankruptcy case.  See Fleet Mortgage Group, Inc. v. Kaneb, 196 F.3d 265, 268-69 (1st Cir. 1999).  Absent such knowledge on the part of a creditor, however, the violation is merely "technical," and no damages are to be awarded.  See In re Will, 303 B.R. 357, 364 (Bankr. N.D. Ill. 2003) (noting that no damages could be awarded under subsection 362(h) where creditor had not been listed, and hence had received no notice of the bankruptcy case and resultant automatic stay); Shadduck v. Rodolakis, 221 B.R. 573, 585 (Bankr. D. Mass. 1998) (noting that no damages are allowable for technical violation, even where debtor nonetheless incurred attorney fees as result of violation).  Normally, however, a creditor that commits

a technical violation of the automatic stay, due to lack of notice, has an affirmative duty to remedy the violation as soon as practicable after acquiring actual notice of the stay. See Will, 303 B.R. at 364.

The determination as to whether a violation of the automatic stay was "willful," as defined in subsection 362(h), poses a factual issue, which we review only for clear error. See In re Campion, 294 B.R. 313, 315 (BAP 9th Cir. 2003). As previously stated, in relation to the McMullen allegation of "bad faith" under subsection 362(b)(4), see supra Section II.A, the bankruptcy court credited the Sevignys' testimony that they did not have notice that the McMullen bankruptcy proceeding remained pending at the time their superior court action to recover their deposit was filed. As soon as McMullen informed them of the automatic stay, the Sevignys promptly dismissed their superior court action. At most, McMullen catalogs tidbits of record evidence which might have persuaded the factfinder to reach a contrary conclusion,[6] but in no event could such evidence compel a finding in McMullen's favor. Thus, the bankruptcy court finding that the Sevignys' violation of the automatic stay was not willful is amply supported by the record, hence cannot constitute clear

---

[6]As but one instance, McMullen notes that the bankruptcy court mailed notices to the Sevignys, yet does not dispute the evidence that the Sevignys' listed address was incorrect, and that the Sevignys asserted that they did not receive the notices.

error.  See Campion, 294 B.R. at 315.

## 2.  **The "Aiding and Abetting" Claims**

As her final claim on appeal, McMullen contends that the bankruptcy court erred in concluding that subsection 362(h) did not permit the McMullen claims for damages against Perry and Williams, wherein she alleged that Perry and Williams knowingly aided and abetted the Sevignys in filing their superior court complaint. As the instant claim involves an issue of statutory interpretation, we review the bankruptcy court decision de novo.  See Charlie Auto Sales, 336 F.3d at 37.  We discern no error of law.

The bankruptcy court correctly noted that McMullen failed to cite any case authority which specifically supported her contention that subsection 362(h) permits the imposition of damages against a person who aids and abets another in violating the automatic stay.  None of the McMullen citations even mentions the phrase "aiding and abetting," nor sets forth or analyzes the elements of such a derivative claim under subsection 362(h).[7]

Moreover, none of the McMullen citations deals with the pertinent question on appeal: can a defendant be found liable in

---

[7]To the extent that it is not an expression of federal bankruptcy law on this issue, the McMullen citation to Massachusetts "aiding and abetting" law is unhelpful. See Matter of Flynn, 169 B.R. 1007, 1022-23 (Bankr. S.D. Ga. 1994) ("[S]ection 362(h) creates an independent federal bankruptcy cause of action which is based exclusively upon a violation of the automatic stay rather than any duty created under state law. The Supreme Court has made clear that 'state law does not operate of its own force' when dealing with a federal cause of action.") (citation omitted).

damages under subsection 362(h) for aiding and abetting a codefendant's mere technical violation of the automatic stay? Instead, the cases she cites involved groups of persons who jointly partook in willful and often egregious violations of the automatic stay, thereby rendering them directly liable – rather than derivatively liable as aiders and abettors – for the resulting subsection 362(h) damages. See Tsafaroff v. Taylor (In re Taylor), 884 F.2d 478, 483 & n.6 (9th Cir. 1989) (rejecting defense that creditors did not violate automatic stay, given that they relied on advice of their counsel, but reserving question as to whether counsel also would be liable for damages); In re Zick, 123 B.R. 825, 828 (E.D. Wisc. 1990) (noting that both wife and attorney violated stay); In re McGinty, 119 B.R. 290, 295-96 (M.D. Fla. 1990) (finding that wife, attorney, and paralegal all engaged in "clear[]" violations of stay); In re Lickman, 297 B.R. 162, 195, 198 (Bankr. M.D. Fla. 2003) (holding that in violating the stay, all defendants acted egregiously and "in concert"); In re Timbs, 178 B.R. 989, 995 (Bankr. E.D. Tenn. 1994) (noting that attorneys who "aided" clients in violating the stay may be subject to subsection 362(h) damages, but observing that their liability is coextensive with the liability of the "person whose actions violated the stay," viz., the clients).

By contrast, the bankruptcy court noted that the Sevignys engaged in a technical violation of the automatic stay and that,

-24-

"[a]bsent such a [willful and compensable] violation [by the Sevignys], the alleged derivative liability of Williams and Perry, if it exists, is lacking a necessary condition precedent." McMullen has elected not to address this particular matter on appeal, choosing instead to focus exclusively upon whether Perry and Williams had the requisite knowledge of the automatic stay and substantially assisted the Sevignys by arranging to procure the affidavit of Lester Pryor.

A plaintiff normally establishes a defendant's liability as an aider and abettor by demonstrating three elements: (1) the primary actor committed a wrongful act that causes injury; (2) the aider and abettor was aware of his role in the overall wrongful activity when he provided the assistance; and (3) the aider and abettor knowingly and substantially assisted the primary actor's wrongful act. See Temporomandibular Joint Implants Recipients v. Dow Chem. Co. (In re Temporomandibular Joint Implants Prods. Liab. Litig.), 113 F.3d 1484, 1495 (8th Cir. 1997); Colonia Ins. Co. v. City Nat'l Bank, 13 F. Supp. 2d 891, 897 (W.D. Ark. 1998); In re Northgate Computer Systs., Inc., 240 B.R. 328, 359 (Bankr. D. Minn. 1999); see generally Restatement (Second) of Torts § 876(b). Assuming arguendo that McMullen adduced enough competent evidence on the latter two elements, the bankruptcy court held that the Sevignys had not committed a wrongful act which caused injury, but simply a technical violation of the automatic stay, which they

promptly cured as soon as McMullen notified them of the automatic stay. As "aiding and abetting" liability is derivative in nature, cf. United States v. Loe, 248 F.3d 449, 458 (5th Cir. 2001) ("An aider-abettor is guilty in a derivative sense; his guilt is contingent on the acts of another."), and the factfinder already had found that the primary actors (viz., the Sevignys) had committed no violation either cognizable or compensable under subsection 362(h), the bankruptcy court correctly found in favor of Perry and Williams as well.[8]

We need not and do not determine whether an "aiding and abetting" claim is cognizable under subsection 362(h). We simply hold that, even if such a claim were cognizable, McMullen utterly failed to demonstrate her entitlement to relief on the record.

**Affirmed**.

---

[8]Without citation to authority, McMullen nonetheless implies that Perry and Williams had an affirmative duty to inform the Sevignys of the automatic stay. Moreover, McMullen has not suggested that Perry and Williams had any form of fiduciary relationship with the Sevignys which would have given rise to such an obligation. Nor have we found case support for this proposition.